[Crim. No. 19804. Sept. 8, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL GARY COOK, Defendant and Appellant.

70

### COUNSEL

Carsel & Carsel and Richard A. Carsel for Defendant and Appellant.

Barry Tarlow, Robert C. Moest and Eric S. Multhaup as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

D. Lowell Jensen, District Attorney (Alameda), John J. Meehan, Assistant District Attorney, and James M. Lee, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

### OPINION

**MOSK, J.**—In *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 100-101 [104 Cal.Rptr. 226, 501 P.2d 234], we held that "pursuant to a motion under Penal Code section 1538.5, a defendant may challenge the factual veracity of an affidavit in support of a [search] warrant and if statements contained therein are demonstrated to be false and if the affiant was unreasonable in believing the truth of such information, those facts must be excised from the affidavit and probable cause tested from the remaining truthful information." (Fn. omitted.)

Although our decision dealt primarily with negligent ("unreasonable") mistakes of fact in an affidavit, we noted that it will apply a fortiori when the affiant actually knows the statements are false at the time he makes them: because "there obviously can be no question of showing a reasonable belief in the truth of deliberate misinformation, any such statements must also be stricken prior to testing the warrant for probable cause." (*Id.*, at p. 101, fn. 14.) ▮▮▮ We expressly left open, however, the issue whether the presence of such intentional falsehoods in an affidavit requires a more drastic response than mere excision, i.e., whether it "should result in automatically quashing the warrant without regard to the effect of those misstatements on probable cause" (*ibid.*).

That issue is now presented for decision. As will appear, we conclude that both the rationale of *Theodor* and the purposes of the constitutional guarantee of freedom from unreasonable searches and seizures compel the exclusion of evidence obtained pursuant to a warrant issued on an affidavit containing deliberately false statements of fact, regardless of the effect of those statements on probable cause. On an additional point, we conclude that the Constitution likewise requires exclusion of evidence seized under a warrant issued after the police conducted an illegal search to "confirm" their prior belief in probable cause.

On June 25, 1974, Detective Gregory of the San Luis Obispo Police Department appeared before a justice court judge and requested a warrant to search a single-family home rented and occupied by defendant. The principal allegations of Detective Gregory's accompanying affidavit were as follows: in February 1974 a federal narcotics agent requested Detective Gregory to investigate a company called Cen-Coast Scientific, which had placed an order with a Los Angeles pharmaceutical firm for certain chemicals commonly used in the manufacture of restricted dangerous drugs. The name appearing on the order was that of defendant. Detective Gregory learned that defendant had applied for a business license for Cen-Coast Scientific, stating its purpose to be the furnishing of biological supplies and equipment, and that defendant was a former chemistry major at California Polytechnic University. The investigation was dropped when defendant withdrew his order.

The affidavit further recited that on June 25, 1974, another federal narcotics agent advised Detective Gregory that Cen-Coast Scientific had placed an order with a San Leandro pharmaceutical firm for phenylacetic acid, also commonly used in manufacturing restricted dangerous drugs. On the same day Detective Gregory received a telephone call from H. E. Smith, manager of the rental units which included defendant's house. Smith told Detective Gregory that he went to defendant's house for the purpose of evicting him for nonpayment of rent; that defendant was not at home, and Smith entered with his passkey; that he smelled an unusual odor and heard the noise of a motor in a back room; that he entered such room and saw several large pieces of chemical apparatus, apparently operating, and a fan that was serving as a ventilator. Smith also told Detective Gregory that he saw a device which appeared to be a pill-making machine, as well as several guns.

The affidavit further alleged that Detective Gregory, together with Detective Osteyee of the San Luis Obispo Sheriff's office, went directly to

defendant's house and found the front door wide open with Smith inside. Through the open door the two officers saw the above-described chemical apparatus in plain view in the back room facing the entrance, and on a counter below the apparatus they saw bottles labeled with the following names: Ether, Acetone, Acetic Acid, Muriatic Acid, Benzylchloride Acid, Sodium Cyanide, and Monobromobenzine. The officers also smelled an unusual odor similar to a compound of ether, acetone, and stale urine. Finally, Detective Osteyee saw and seized a "roach" or partly consumed marijuana cigarette in plain sight on the floor, approximately 18 inches inside the front door.

The affidavit concluded by reciting that Detective Gregory thereafter consulted Charles Hall, a federal narcotics chemist, and described to him the apparatus and chemicals seen in defendant's house, the odor there detected, and the chemicals ordered by Cen-Coast Scientific. Hall advised him that the apparatus, chemicals, and odor are consistent with the manufacture of amphetamines, and gave as his opinion that defendant was operating an illicit laboratory on the premises for the production of restricted dangerous drugs.

The magistrate issued the warrant requested, and law enforcement authorities conducted an extensive search of defendant's residence. On the basis of evidence found in the search, defendant was charged by indictment with multiple counts of possessing marijuana and restricted dangerous drugs, and of manufacturing such drugs and possessing them for sale. (Health & Saf. Code, §§ 11357, 11377-11379, 11383.)

Defendant moved to suppress the evidence on the ground that it was illegally obtained because the issuance of the warrant lacked probable cause and the search violated state and federal constitutional standards. (Pen. Code, § 1538.5, subd. (a)(2).) Defendant accompanied this motion with a sworn declaration by his counsel, charging that the affidavit of Detective Gregory contained numerous intentional misstatements and omissions. The declaration set forth defendant's proposed proof of such charges, and requested permission to controvert other factual allegations of the affidavit at the suppression hearing.

When that hearing took place, however, the prosecution objected to the taking of any testimony to support defendant's charges of perjury, contending that such evidence would be irrelevant because defendant's sole remedy was the *Theodor* procedure of asking the court to excise factual misstatements in the affidavit and test the remainder for probable

cause. The prosecution then offered, "for the sake of argument," to assume that defendant's charges of perjury were all true and to voluntarily excise the challenged portions of the affidavit.

Believing *Theodor* to be controlling, the court sustained the objection to testimony and accepted the prosecution's offer of excision. The court accordingly refused to allow defendant (1) to call Detective Gregory for cross-examination into the truth of his affidavit, (2) to call any witness to attack Detective Gregory's credibility, (3) to controvert any allegations of the affidavit not specifically questioned in the motion to suppress, and (4) to prove that material facts were deliberately omitted from the affidavit.

At the court's request a chart listing the unchallenged allegations remaining in the affidavit was then prepared by counsel and introduced in evidence.[1] The prosecution was allowed to call as a witness Charles Hall, the government chemist relied on in the affidavit, and elicit his testimony that the remaining facts would still support his opinion that defendant was illegally manufacturing restricted dangerous drugs.[2]

On the basis of the foregoing evidence the court ruled that the affidavit as excised was legally sufficient to support the issuance of the search warrant, and denied the motion to suppress.

Defendant thereafter pleaded guilty, the imposition of sentence was suspended, and he was placed on probation. He appeals from the

[1] The chart read as follows:
"1. Single family residence
"2. Two orders of phenylacetic acid
"3. Defendant is ex-chemistry major
"4. Business license—biological supplies and equipment.
"5. Landlord observes:
 (a) unusual odor
 (b) large pieces of chemical apparatus
 (c) fan

 (e) guns in residence
"6. From front door, police see:
 (a) chemical apparatus
 (b) Osteyee smells odor of acetone, ether, or stale urine."
Item 5(d), which had referred to the alleged pillmaking machine, was included through oversight and was deleted by the deputy district attorney. With respect to item 5(e), we note that in testifying before the grand jury Detective Gregory conceded the guns in defendant's residence were lawfully possessed.

[2] Hall based his opinion on only three of these facts: the orders of phenylacetic acid, the odor of stale urine, and the location in a private home. Indeed, under questioning by the court he stated the latter fact was not essential to his opinion and would merely "strengthen" it.

judgment (Pen. Code, § 1237, subd. 1), attacking only the legality of the search (Pen. Code, § 1538.5, subd. (m)).

I

We held in *Theodor* that "Before a hearing is required to test the veracity of an affidavit, the defense must relate, with some specificity, its reasons for contending that the affidavit is inaccurate." (8 Cal.3d at p. 103.) Defendant has amply fulfilled that requirement, as appears from the following summary of his counsel's sworn declaration in support of the motion to suppress:

Shortly after defendant's arrest counsel retained the services of Jack R. West, a state-licensed private investigator. West is retired from the Los Angeles Police Department after a 25-year career during which he served as investigator in virtually every major field of criminal activity. He holds a law degree, as well as state credentials to teach college-level courses in law enforcement. Prior to his employment by defendant he also served as investigator for the San Luis Obispo District Attorney. In the present case West conducted an extensive investigation totaling more than 300 hours into the circumstances surrounding the procurement of the search warrant.

The declaration then set forth West's major findings as follows:

1. Many of the allegations in Detective Gregory's affidavit were the product of information or observations obtained by police officers in the course of at least two illegal searches of defendant's residence *prior to* applying for the warrant. On at least one of these searches the officers were accompanied by Detective Gregory and Deputy District Attorney Robert King. It was King who subsequently drafted the affidavit sworn to by Detective Gregory. Both he and Detective Gregory thus knew that the affidavit (1) omitted to state the fact of the prior searches and (2) contained certain allegations which were absolutely false and others which were intentionally misleading.

2. Contrary to the affidavit, Smith did not go to defendant's house for the purpose of evicting him. Smith was extensively interviewed by West, and told the latter he went to defendant's house in order to collect past due rent.

3. The affidavit described in minute detail the shape and dimensions of each component of the chemical apparatus found by Smith, and implied that the latter furnished this description to the police. But Smith told West he did not have his glasses with him at the time and could not see very well, and that he gave no such measurements to the police.

4. Contrary to the affidavit, Smith saw no "pill-making machine" near the chemical apparatus or anywhere else in the house, for the simple reason that none was there. No such machine is mentioned in the police report or the list of evidence furnished to defendant pursuant to discovery, and chemist Hall testified to the grand jury in effect that it would have been very unusual to have found such a machine on the premises.

5. Despite the foregoing, the affidavit drafted by King and sworn to by Detective Gregory recited that "Your affiant was unable to observe the 'pill making machine' described by Mr. Smith due to its described location, and the vantage point had by your affiant at the front door." Yet because of their prior search both King and Gregory must have known that the true reason the latter could not see a pill-making machine was because none was in the house.

6. Contrary to the affidavit, the front door of defendant's house was not "fully opened" when Detectives Gregory and Osteyee arrived. Smith so advised West, and added that he was standing in the doorway at the time.

7. Contrary to the affidavit, the two detectives could not have seen the chemical apparatus "in plain sight." On the basis of Smith's explanation of the circumstances, West conducted duplication tests and determined it would have been impossible for anyone standing outside defendant's front door to have a "plain sight" view of the apparatus and chemicals in the back room of the house.

8. Contrary to the affidavit, the two detectives could not have read the labels on the chemical bottles from their vantage point outside the front door. West measured the letters on the labels and found none was greater than one-quarter of an inch in height; he also determined that the distance from the bottles to the front door was more than 18 feet. Duplicating these conditions, West found it would have been virtually impossible for anyone to read the labels at that distance.

9. In addition, after a vector analysis based on police reports and the prosecution's photographs of the scene, West found that the bottle of sodium cyanide, in particular, had been in such a position that no one could have seen it from the front door under any circumstances.

10. Contrary to the affidavit, Detective Osteyee did not observe a "roach" on the floor approximately 18 inches inside the front door. Smith flatly denied this claim, and explained instead that Detective Osteyee directed him to look through defendant's house and bring out any suspected marijuana. Smith complied, went to an interior room invisible to anyone standing at the front door, and brought the "roach" in question back to the two detectives. He then placed the "roach" on a plate on a kitchen shelf adjacent to the front door. In corroboration of this statement, West viewed films of defendant's house made by a local television station at the time the search warrant was executed; the films show that the plate holding the marijuana was located on the kitchen shelf where Smith said he had put it after showing it to the two detectives.

## II

Defendant contends at length that under *Theodor* the trial court's refusal to allow him to put on his proof of these assertions deprived him of his statutory right to controvert the grounds of the warrant (Pen. Code, §§ 1538.5, subd. (c), 1539, subd. (a)) and of due process of law.

The argument is somewhat misdirected. We concluded in *Theodor* that "once a defendant makes a prima facie showing of inaccuracy, the burden then shifts to the prosecution to negate that showing," and "once the court finds that the affidavit contains an inaccurate statement of fact, it is incumbent on the prosecution to demonstrate that the affiant's belief that the erroneous statements were true was nonetheless reasonable under the totality of circumstances." (8 Cal.3d at p. 102.) But in so stating we were distributing burdens of proof, not imposing duties. Nothing in *Theodor* prohibits the prosecution from waiving its right to attempt either to rebut the defendant's showing of inaccuracy or to make its own showing of the reasonableness of the affiant's reliance; the prosecution may instead elect to concede both issues, stipulate to the excision of the challenged material, and stand on its view of the sufficiency of the affidavit as thus edited. In that event, of course, the defendant has no opportunity to "prove" his assertions of error; but neither has he ground for complaint, as the assertions will have served their purpose of bringing

about a judicial review of the issue of probable cause on a record purged of all claimed factual inaccuracies.[3]

The foregoing reasoning derives from *Theodor,* however, and can confidently be applied only to misstatements governed by the express holding of that decision, i.e., those resulting from *negligent* mistakes. As noted at the outset, we expressly declined in *Theodor* to reach the question whether the use of *intentional* misstatements in the affidavit "should result in automatically quashing the warrant without regard to the effect of those misstatements on probable cause" (8 Cal.3d at p. 101, fn. 14). If the answer to that question is in the affirmative, as defendant also contends, he should have been permitted to prove his charges at the suppression hearing and will be entitled to an opportunity to do so on remand. We turn to that underlying issue.

Although it did not adjudicate the matter, *Theodor* furnishes a helpful point of departure for our inquiry. We began our analysis there by holding that on a motion to suppress evidence pursuant to Penal Code section 1538.5, a defendant has the right to go behind the face of the search warrant affidavit and controvert the truth of the facts alleged. (8 Cal.3d at pp. 90-95.) Because we held the procedure was authorized by statute (Pen. Code, §§ 1538.5, 1539, 1540), we declined (at p. 90) to reach the defendant's alternate contention that it was also compelled by the Fourth Amendment.[4]

Nevertheless, we proceeded to summarize the constitutional argument as follows (*id.,* at pp. 90-91, fn. 6): "the thrust of *Aguilar* v. *Texas* [1964] 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], with its emphasis on the factual basis for an affiant's conclusion of probable cause, naturally presupposes correct, and not perjured or erroneous facts. 'This principle is frustrated not only when a magistrate confronts conclusions rather than facts in the affidavit, but also when substantial falsehoods are the basis on

---

[3]This does not mean that at the hearing the defendant is also foreclosed from attacking allegations of the affidavit *other than* those specifically challenged in his declaration or motion. We hold to the contrary below. (Part IV, *post.*) All we say here is that if the defendant charges that any particular allegation is negligently inaccurate and the prosecution concedes the claim, the defendant cannot insist on putting on evidence to prove it.

[4]In *Theodor* the phrase "Fourth Amendment" was used for convenience to refer to both the Fourth Amendment to the United States Constitution and the similar provision of article I, section 13, of the California Constitution. (See, e.g., *People* v. *Triggs* (1973) 8 Cal.3d 884, 891-892, fn. 5 [106 Cal.Rptr. 408, 506 P.2d 232].) As will appear, the decision herein is based solely on the latter provision.

which a magistrate must find the existence or absence of probable cause. In either case, the effect is to destroy the magisterial power to draw an inference from accurate, objective information.' (Comment, *The Outwardly Sufficient Search Warrant Affidavit: What If It's False?* (1971) 19 U.C.L.A. L.Rev. 96, 108 . . . .)"[5]

Having recognized the defendant's right to disprove factual averments of the affidavit, we then addressed the question of remedy in *Theodor.* Without hesitation we applied an exclusionary rule and held that offending misstatements must be "excised" from the affidavit. Although we did not articulate our reason for so holding, we did discuss at length the question of which kinds of misstatements—innocent, negligent, or intentional—will be excised (8 Cal.3d at pp. 95-101); and from that discussion it plainly emerges that our decision to excise was based on constitutional considerations.

Thus we rejected a proposal to require excision of innocent—i.e., reasonable—mistakes "as being inconsistent with the overriding principle of reasonableness which governs the application of the Fourth Amendment to the criminal law. Instead, we conclude that only when the affiant has acted unreasonably in making factual mistakes must those errors be excised from the affidavit before testing the existence of probable cause. While undeniably misstatements impede the function of the magistrate, once it has been determined that the affiant has acted reasonably under the circumstances, *little more can be required of him.* To exclude evidence obtained pursuant to a warrant issued on the basis of facts upon which an affiant has reasonably relied as being accurate *serves no purpose of deterrence to unlawful conduct* since, by definition, the affiant has already made a reasonable attempt to comply with the requirements of the Fourth Amendment." (Italics added.) (*Id.,* at p. 97.)

The negative implication, of course, is that "more can be required" of an affiant who makes "unreasonable"—i.e., negligent or intentional—misstatements: in such a case exclusion does serve the "purpose of

---

[5] A recent author restates the argument somewhat more broadly: "it makes utterly no sense to ask only whether the magistrate drew a reasonable inference without asking whether the information from which he drew the inference was acquired carelessly or transmitted inaccurately. Probable cause and its process are a whole. If any part is defective, if any functionary performs improperly, the whole fails, thereby increasing the risk of invading innocent privacy and subverting the fourth amendment's primary value." (Fn. omitted.) (Herman, *Warrants for Arrest or Search: Impeaching the Allegations of a Facially Sufficient Affidavit* (1975) 36 Ohio St. L.J. 721, 740.) The article presents a lucid analysis of many aspects of the question before us.

deterrence to unlawful conduct," because it induces the affiant to thereafter make "a reasonable attempt to comply with the requirements of the Fourth Amendment."

To declare that constitutional considerations require an exclusionary rule to operate in these circumstances, however, is not to determine the scope of that rule. ■ In the case of a warrantless search violative of the Constitution, it is settled that the exclusionary rule bars admission of the evidence directly obtained therefrom (*People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513]; *Mapp* v. *Ohio* (1961) 367 U.S. 643, 656 [6 L.Ed.2d 1081, 1090-1091, 81 S.Ct. 1684, 84 A.L.R.2d 933]) and any additional evidence derived by use of that primary evidence (*People* v. *Berger* (1955) 44 Cal.2d 459, 462 [282 P.2d 509]; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455-456, 83 S.Ct. 407]). As will appear (part V, *post*), the same result generally follows from a search which is conducted under color of a warrant but is constitutionally unreasonable on other grounds: the evidence directly or indirectly obtained in such a search must be excluded.

By parity of reasoning we could have held in *Theodor* that when the warrant is issued on an affidavit containing erroneous statements of fact which the affiant has no reasonable grounds for believing to be true, the exclusionary rule should operate in its normal fashion, i.e., the warrant should be quashed and the evidence obtained in the ensuing search should be held inadmissible. But we did not do so. Rather, we declared (8 Cal.3d at p. 101, fn. 14) that "We do not hold that the presence in an affidavit of inaccurate facts caused by unreasonable police activity automatically vitiates the warrant. We require only that such information be deleted and the warrant's validity be tested by the remaining accurate information. The warrant will not be quashed if that remaining information is sufficient, under settled standards, to constitute probable cause for the search." In effect, we applied the exclusionary rule not to the evidence produced by the warrant but to the misstatements in the affidavit leading to its issuance.

Again our rationale for so holding was not spelled out, and we therefore address the matter now. ■ Manifestly the reason had nothing to do with the fact that in *Theodor* we were dealing primarily with negligent as opposed to intentional misstatements: not only does the exclusionary rule apply to negligent as well as purposive violations of the Constitution, but in many cases evidence obtained under a warrant has been held inadmissible even though the constitutional violation was

wholly unintentional, e.g., when the warrant failed to describe with sufficient particularity the place to be searched or the property to be seized. (See *People* v. *Dumas* (1973) 9 Cal.3d 871, 880-881 [109 Cal.Rptr. 304, 512 P.2d 1208]; *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 249-250 [118 Cal.Rptr. 166, 529 P.2d 590].)

Instead, the explanation for our decision in *Theodor* to excise rather than exclude lies in the dual nature of the magistrate's function in ruling on an application for a search warrant. ▮ ▮▮▮ The magistrate is required to make in effect two successive determinations: first he must satisfy himself that the facts are as the applicant states them to be, then he must consider whether those facts constitute probable cause for issuance of the warrant.[6] Because the magistrate must ordinarily rely on the affidavit as the source of his facts, the first inquiry turns on his view of the veracity of the affiant. ▮ By analogy to indictment and information proceedings, we have recognized "the rule that it is for the magistrate to determine the credibility of witnesses and affiants providing information under oath." (*Skelton* v. *Superior Court* (1969) *supra,* 1 Cal.3d 144, 154, fn. 7.) Neither the superior court nor an appellate court may substitute its judgment on such questions for that of the magistrate. (*Id.,* at p. 154.)

Accordingly, when the magistrate issues a warrant the reviewing court must presume in the first instance that he found the affiant correctly believed in the truth of each of the factual allegations of the affidavit. If it is thereafter shown that the affiant was negligently mistaken in certain of his allegations, they must be excised from the affidavit on the constitutional grounds recognized in *Theodor.* But the remainder of the allega-

---

[6]We take this opportunity to refine the standard of probable cause to search that we reiterated in *Theodor,* i.e., facts sufficient to lead a man of ordinary caution and prudence to believe and conscientiously to entertain a strong suspicion that "a crime has been or is being committed" on the premises. (8 Cal.3d at p. 96.) A variation of the wording, also found in our opinions, calls for the same level of belief in "the guilt of the accused." (*Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485].) Both formulations correctly if somewhat archaically point to the degree of persuasiveness required—how "probable" must be the "cause"—to wit, a substantial probability rather than a mere suspicion, rumor, or hunch. (See, e.g., *People* v. *Triggs* (1973) *supra,* 8 Cal.3d 884, 895.) But their focus on the commission of a crime or the guilt of the accused, while appropriate as a standard for probable cause to issue an *arrest* warrant, deflects the magistrate's attention from the precise question he must decide in ruling on an application for a search warrant. For that purpose the more appropriate standard of probable cause is whether the affidavit states facts that make it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought. (*People* v. *Mack* (1977) 66 Cal.App.3d 839, 845 [136 Cal.Rptr. 283]; *People* v. *Superior Court (Brown)* (1975) 49 Cal.App.3d 160, 165 [122 Cal.Rptr. 459]; see also *People* v. *Gray* (1976) 63 Cal.App.3d 282, 287 [133 Cal.Rptr. 698].)

tions are untouched by the mistake, and under the foregoing distribution of the factfinding power the reviewing court should accept them as true.

To exclude the unaffected 'allegations, moreover, would serve no constitutional purpose. A court admittedly engages in a fiction when, after excising negligent misstatements in an affidavit, it tests the remainder for probable cause: in so doing it in effect turns back the clock, puts itself in the magistrate's position, and asks whether the magistrate would have issued the warrant if the affidavit presented to him had contained only the remaining allegations. Yet because those allegations are presumptively true, it does not increase the risk of invading innocent privacy for the court to rely on them in reviewing the final step in the magistrate's function, i.e., in determining whether his conclusion of probable cause rested on a sufficient factual foundation.

### III

In the case at bar, however, it is alleged that the misstatements in the affidavit were not merely negligent, but intentional. Defense counsel's declaration takes issue principally with the sworn statements of Detective Gregory that (1) Smith saw a pill-making machine in defendant's house, (2) when the officers arrived on the scene the front door was wide open and the chemical apparatus was "in plain sight," (3) the officers could read the labels on the chemical bottles from their vantage point outside the front door, and (4) Detective Osteyee saw and seized a "roach" on the floor 18 inches inside the room. It is vigorously asserted that each of the foregoing statements is false, and that Detective Gregory knew they were false at the time he made them under oath.

These are grave imputations of official misconduct: as the trial court acknowledged to defense counsel, "You have made some very serious charges against the District Attorney and his people and the police." If true, the charges mean at least that the deputy district attorney who drafted the affidavit grossly abused his authority, and that the police officer who swore to the veracity of its allegations—assuming for present purposes they constituted "material matter" within the meaning of Penal Code section 118—committed perjury. "Perjury is a powerful word, but it must be recognized that no other will suffice." (Grano, *A Dilemma for Defense Counsel: Spinelli-Harris Search Warrants and the Possibility of Police Perjury* (1971) U.Ill.L.F. 405, 408.)[7] The issue is whether the

---

[7] We do not view this case in a vacuum. The author of the cited article served for a year as a prosecutor in a large eastern city, handling almost exclusively motions to suppress

rationale of our decision in *Theodor* not to quash the warrant applies on a showing of such perjury.

Contrary to the case of negligent mistakes, excision of deliberate falsehoods in an affidavit does not leave the remaining allegations unaffected and hence presumptively true. The fact that the misstatements are intentional injects a new element into the analysis, to wit, the doctrine that a witness knowingly false in one part of his testimony is to be distrusted in the whole. Encapsulated in the common law maxim "falsus in uno, falsus in omnibus," long codified in our statutes (former Code Civ. Proc., § 2061, subd. 3), and given as a basic instruction in virtually every jury trial (CALJIC No. 1.30),[8] the doctrine is deeply rooted in California civil and criminal law. (See, e.g., *People* v. *Strong* (1866) 30 Cal. 151, 155-156; *People* v. *Soto* (1881) 59 Cal. 367; *Estate of Friedman* (1918) 178 Cal. 27, 32 [172 P. 140]; *Nelson* v. *Black* (1954) 43 Cal.2d 612, 613 [275 P.2d 473]; *Florez* v. *Groom Development Co.* (1959) 53 Cal.2d 347, 356 [1 Cal.Rptr. 840, 348 P.2d 200].) No reason appears why it should not apply to sworn statements in an affidavit for a warrant as well as in trial testimony.

The relevance of this doctrine to the present inquiry is plain. If the magistrate had known the officer was deliberately lying to him in making certain of the allegations in the affidavit, he might well have disbelieved some or all of the remainder. His ignorance of this crucial fact undermines his determination of the officer's credibility, and the review-

---

evidence. "The conclusion reached on the basis of this experience," he reports, "is that the police often are not adverse to committing perjury to save a case. . . . The strength of the urge to distort facts should not be underestimated." (Fn. omitted.) (*Id.,* at pp. 409, 410.)

Other commentators echo and document this observation. Thus the former chief trial deputy of a federal defense office in California has stated that "A survey of individual cases in which police perjury has been exposed demonstrates the many ways in which perjury is employed to 'legalize' searches. False statements of fact in affidavits for search warrants are commonly utilized to deceive magistrates into issuing search warrants." (Sevilla, *The Exclusionary Rule and Police Perjury* (1974) 11 San Diego L.Rev. 839, 869.) And an article relied on in *Theodor* reviews the literature and concludes that "Despite the lack of statistics on deliberate police falsehood, it is clear that the pressures on law enforcement officials cause widespread police impropriety at all stages of criminal proceedings. The swearing out of affidavits is no exception to the problem of police misconduct." (Fns. omitted.) (Comment, *The Outwardly Sufficient Search Warrant Affidavit: What If It's False?* (1971) 19 UCLA L.Rev. 96, 111-112, and authorities cited.)

[8] The instruction states in relevant part: "A witness false in one part of his testimony is to be distrusted in others; that is to say, you may reject the whole testimony of a witness who wilfully has testified falsely as to a material point, unless, from all the evidence, you shall believe that the probability of truth favors his testimony in other particulars."

ing court can no longer rely on that determination for the facts necessary to test the magistrate's conclusion of probable cause.[9] In short, although the court can excise the intentionally false allegations it cannot presume the remainder to be true. Lacking a reliable factual basis in the affidavit, the court has no alternative under settled constitutional principles but to quash the warrant and exclude the products of the search. (See, e.g., *People* v. *Smith* (1976) 17 Cal.3d 845 [132 Cal.Rptr. 397, 553 P.2d 557]; *Alexander* v. *Superior Court* (1973) 9 Cal.3d 387 [107 Cal.Rptr. 483, 508 P.2d 1131].)

In this context, moreover, the exclusionary sanction is particularly necessary. "Were the judicial response to be merely the elimination of the false statements and the assessment of the affidavit's adequacy in the light of the remaining averments, enforcement officers would be placed in the untoward position of having everything to gain and nothing to lose in strengthening an otherwise marginal affidavit by letting their intense dedication to duty blur the distinction between fact and fantasy." (*United States* v. *Belculfine* (1st Cir. 1974) 508 F.2d 58, 63.) That incentive will be removed if the result of uncovering perjury in the affidavit is to quash the warrant and suppress the evidence.[10]

The exclusionary rule is also likely to be highly effective in these circumstances. It does not require police officers to know or even

---

[9]The fault, of course, is not in the magistrate's knowledge or perception, but in the unavoidable circumstance that the application for the warrant is not an adversary proceeding: "Judges are not omniscient. They have no special ability to determine that they are being deceived when they deal *ex parte* with experienced police officers who testify routinely in court. When the policeman appears *ex parte* before the magistrate to procure a warrant, with his affidavit, the judicial officer has no divining rod to determine whether the affidavit is true or false. All he can do is read it, and if it is not internally inconsistent, all that is left him is the legal conclusion whether the 'facts' asserted in the affidavit establish probable cause." (*United States* ex rel. *Petillo* v. *State of N.J.* (D.N.J. 1975) 400 F.Supp. 1152, 1182, vacated and remanded by order *sub nom. Albanese* v. *Yeager* (3d Cir. 1976) 541 F.2d 275.)

[10]At this late date we need not pause to refute the Attorney General's claim that a sufficient deterrent effect arises from the theoretical possibility of prosecuting the affiant for the offense of perjury. The inadequacy of criminal sanctions against the police is one of the foundations of *Cahan, Mapp,* and their many progeny. Even leading critics of the exclusionary rule no longer propose such sanctions as a viable alternative. (See, e.g., *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 420-424 [29 L.Ed.2d 619, 640-643, 91 S.Ct. 1999] (dis. opn. of Burger, C.J.); *Stone* v. *Powell* (1977) 428 U.S. 465, 496 [49 L.Ed.2d 1067, 1088-1089, 96 S.Ct. 3037] (same).) In the case at bar, for example, it would be unrealistic to anticipate that Detective Gregory might be prosecuted by the district attorney whose deputy joined him in the prior illegal search and drafted the very affidavit now under attack.

anticipate complex constitutional doctrines. Nor does it penalize them for acts which, although negligent when viewed with hindsight, were done in good faith at the time. It simply seeks to deter the police from lying to the magistrate—surely an obvious prohibition which all can understand and obey.[11]

A recent decision of the United States Supreme Court holds under the Fourth Amendment, as we do under the California Constitution and statutes, that a defendant is entitled to challenge the veracity of a search warrant affidavit and prove it contains statements that were either knowingly false or made with reckless disregard for the truth. (*Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674].) But in two significant respects the decision would afford our citizens less protection than is guaranteed to them under California law: it forbids such a challenge when the misstatements are negligent rather than intentional, contrary to our decision in *Theodor*; and even when deliberate lies are proved it requires only that they be excised and the remainder of the affidavit be tested for probable cause, contrary to our holding in the case at bar under article I, section 13, of the California Constitution.[12] In these circumstances it is settled doctrine (*People* v. *Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108], and cases cited) that *Franks* is not to be followed in California and that all challenges to the veracity of a search warrant affidavit in our courts are to be governed by *Theodor* and article I, section 13, of the California Constitution as explicated herein.[13]

[11]As a recent federal decision aptly put the point, "We continue to read of criminals who are 'going free' because 'the constable has blundered.' *People* v. *Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (Cardozo, J.) *See, e.g., Stone* v. *Powell, supra* [428 U.S. 465, 496], 96 S.Ct. 3037 (concurring opinion of Burger, C.J.). Cardozo's masterful imagery calls to mind a dull-witted but honest servant of the law, floundering in a sea of emergent and sophisticated jurisprudential choices while a crafty criminal squirms away through a constitutional loophole. No doubt this is sometimes the case. Perhaps it even happens often. *But what do 'blunders' have to do with perjurious affidavits,* fictional informers or other devices deliberately employed to enlist the courts as 'accomplices in the willful disobedience of a Constitution they are sworn to uphold?' " (Italics added.) (*United States ex rel. Petillo* v. *State of N.J.* (D.N.J. 1976) 418 F.Supp. 686, 689, fn. 4.)

[12]It does not appear from the face of the *Franks* opinion that the reasoning we here find persuasive was considered by the high court.

[13]A number of our sister states have likewise held that intentional misstatements in the affidavit require the warrant to be quashed without regard to their effect on probable cause. (See, e.g., *State* v. *Boyd* (Iowa 1974) 224 N.W.2d 609, 616; *State* v. *Spero* (1977) 117 N.H. 199 [371 A.2d 1155, 1158] (based on state constitution, but limited to intentional or reckless misrepresentation); *Commonwealth* v. *D'Angelo* (1970) 437 Pa. 331 [263 A.2d 441, 444]; *State* v. *Goodlow* (1974) 11 Wn.App. 333 [523 P.2d 1204]; *Schmidt* v. *State* (1977) 77 Wis.2d 370 [253 N.W.2d 204, 207-208]; cf. *Com.* v. *Reynolds* (1977) — Mass. — [370 N.E.2d 1375, 1379-1380] (*semble*).)

## IV

We conclude that the trial court erred in denying defendant the opportunity to prove that the affidavit for the search warrant contained knowingly false statements of fact. Because defendant will be entitled to litigate that issue on remand, we briefly address the procedure that will govern the hearing.

We begin with the burden of proof. As noted above, we held in *Theodor* that once the defendant has demonstrated that the affidavit contains misstatements of fact, the burden shifts to the prosecution to prove the affiant had reasonable grounds to believe the statements were true. (8 Cal.3d at p. 102.) Our rationale was that "To require the defendant to prove unreasonableness would impose an insurmountable burden on him. Since the affiant knows the circumstances under which he was led to believe that the inaccurate facts were true, he alone is in a position to justify his errors as reasonable under the circumstances." (*Ibid.*)

The reasoning is no longer appropriate, however, when the defendant charges that the misstatements were deliberate, i.e., that the affiant knew they were false at the time he made them. There are no special "circumstances" bearing on the issue that are known to the affiant alone, and he is no better placed to disprove his alleged perjury than the defendant is to prove it. There is accordingly no reason to deviate from normal rules in this matter, and the defendant should retain both the burden of producing evidence of the affiant's knowledge of falsity (Evid. Code, § 550) and the ultimate burden of proof on that issue (Evid. Code, § 500).

Yet for several reasons these burdens are not "insurmountable" in the sense of *Theodor*. First, because the normal rule also governs the degree or quality of the evidence required (Evid. Code, § 115), the defendant need only prove the affiant's knowledge by a preponderance of the evidence. (*State* v. *Boyd* (Iowa 1974) *supra,* 224 N.W.2d 609, 616.)

Second, in view of the gravity of the charge it is unrealistic to expect the affiant will lightly admit that he knew his sworn allegations were false. The defendant may nevertheless undertake to prove that fact by other, traditional means: " 'The knowledge a person may have when material to an issue in a judicial proceeding is a fact to be proven as any other fact. It differs from physical objects and phenomena in that it is a

state of mind like belief or consciousness and cannot be seen, heard or otherwise directly observed by other persons. It may be evidenced by the affirmative statement or admission of the possessor of it. If he is silent or says he did not have such knowledge, it may be evidenced in other ways,' i.e., by circumstantial evidence and the inferences which the trier of fact may draw therefrom." (*Landeros* v. *Flood* (1976) 17 Cal.3d 399, 415, fn. 13 [131 Cal.Rptr. 69, 551 P.2d 389].)

In the case at bar, for example, defense counsel's declaration offers such proof in the form of the experiment of the investigator West demonstrating that it would have been impossible for anyone to read the labels on the chemical bottles from outside defendant's front door, as the affiant claimed. Of course, if the defendant has any direct evidence in the form of testimony of percipient witnesses contrary to that of the affiant—as here, the testimony of the manager Smith summarized in counsel's declaration—it too is admissible and the conflict will be for the trier of fact to resolve.

Third, for the same reason—the gravity of the charge—it may fairly be anticipated that trial judges will be reluctant to find that police officer affiants actually knew their allegations were false at the time of making them. There may be less reluctance, however, to find at least that certain affiants must have realized they did not in fact know their allegations were correct. In such circumstances, the defendant will have the benefit of the rule that a sworn misstatement made with conscious indifference to whether it is true or false is deemed the equivalent of an allegation actually known to be untrue. Penal Code section 125 provides that "An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false." . It has long been settled that the Legislature "intended by this section to declare that when one makes an unqualified statement of a fact as true which he does not know to be true, under circumstances in which a statement by him of a fact as true which he knows to be false would constitute perjury, such unqualified statement will itself constitute perjury." (*People* v. *Von Tiedeman* (1898) 120 Cal. 128, 134 [52 P. 155]; accord, *People* v. *Agnew* (1947) 77 Cal.App.2d 748, 753 [176 P.2d 724].)[14]

---

[14]Even when no oath is involved, reckless disregard for the truth may be deemed the equivalent of intentional falsity. Thus the crime of theft is committed by one "who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . ." (Pen. Code, § 484.) The statute has long been

The rule is particularly appropriate in the present context. Proof that a sworn allegation in an affidavit for a search warrant was both false and made with reckless disregard for the truth surely negates any claim of a bona fide but negligent mistake within the meaning of *Theodor,* and renders the entire affidavit as untrustworthy as if the affiant had knowingly lied: "law enforcement agents presenting evidence to magistrates could make a mockery of the magistrate's role if, in the necessarily ex parte proceeding, they could freely employ false allegations in order to secure the warrant. The same could likewise be true if the agents could, with impunity, draft affidavits with utter recklessness as to truth or falsity. In either instance there would be a lack of good faith in the performance of the agent's duty to the judicial officer." (*United States* v. *Luna* (6th Cir. 1975) 525 F.2d 4, 8; accord, *Franks* v. *Delaware* (1978) *supra,* 438 U.S. 154.) For the reasons given above (part III, *ante*), application of the exclusionary sanction to evidence obtained by such means is both necessary and effective.

▮ Fourth, the defendant need only prove the affiant knew his allegations were false; it is not necessary to further prove the affiant made the allegations with the specific intent to deceive the magistrate. That would indeed be a difficult burden to sustain, and in any event the fact to be proved would be of little if any relevance: once the defendant has shown the affiant knowingly lied under oath in any respect, the remainder of his allegations become suspect regardless of what his ulterior motives may have been. The sole precedent for requiring proof of specific intent to deceive is *United States* v. *Thomas* (5th Cir. 1973) 489 F.2d 664, 669 (followed in *United States* v. *Luna* (6th Cir. 1975) *supra,* 525 F.2d 4, 7-8). But *Thomas* provides neither reasoning nor authority to support its rule; the recent Supreme Court decision in *Franks* does not impose this requirement; and the First Circuit has expressly rejected it (*United States* v. *Belculfine* (1974) *supra,* 508 F.2d 58, 63). We agree with the latter court (*ibid.*) that "We see no basis for confining this sanction to false statements made with the specific intent to deceive the magistrate as opposed to false statements merely intended to 'round out the picture.' " In either event the perjury undermines the magistrate's determination of the credibility of the affiant and hence the reviewing court's power to test probable cause.

construed to permit conviction of a defendant who makes such representations "knowing them to be false, or (which is tantamount to knowledge of falsity) recklessly and without information justifying a belief that they were true." (*People* v. *Cummings* (1899) 123 Cal. 269, 271-272 [55 P. 898]; accord, *People* v. *Schmitt* (1957) 155 Cal.App.2d 87, 109 [317 P.2d 673], and cases cited.)

Finally, the defendant is not limited to proving the falsity of only the particular allegations he challenged in his prima facie showing. In making that showing by declaration in the case at bar defendant recited that he "specifically reserves the right to challenge any other allegation of said affidavit, at the time of the hearing of this motion, based upon the possibility (nay, probability) that additional evidence of falsity or inaccuracy will become known to Defendant and the Court at or before the time of hearing." Even without such a reservation the challenge is permissible; to hold otherwise would frustrate the purposes of *Theodor* and the rule we declare herein. Much of the information in an affidavit for a search warrant is either hearsay or is derived from anonymous and confidential sources. In most instances it would be difficult if not impossible for the defendant to discover in advance of the hearing each and every allegation that he can ultimately prove false. Yet once he has shown that certain allegations were knowingly untrue, the integrity of the entire affidavit is cast into doubt. We do not hereby sanction a routine "fishing expedition" in cases involving a search warrant; but if, as here, the defendant's preliminary investigation discloses specific facts which would lead a reasonable man to suspect that one or more of the allegations in the affidavit were perjurious, he is entitled to inquire at the hearing into the truth of the remaining allegations.

## V

Defendant next contends the affidavit was defective not only because of intentional misstatements but also because of intentional omissions. We recognized in *Theodor* that "although most mistakes occur in relating events which have transpired, an affidavit may be inaccurate because of the failure to *include* information which might otherwise negate a finding of probable cause." (8 Cal.3d at p. 96, fn. 11.)

We did not pursue the matter in *Theodor* because no such omissions were alleged. In three subsequent decisions of the Court of Appeal the issue was addressed in the context of a challenge to search warrant affidavits on the ground that omissions therein undermined the magistrate's determination that an informant was reliable. (*People* v. *Neusom* (1977) 76 Cal.App.3d 534 [143 Cal.Rptr. 27]; *Morris* v. *Superior Court* (1976) 57 Cal.App.3d 521 [129 Cal.Rptr. 238]; *People* v. *Barger* (1974) 40 Cal.App.3d 662 [115 Cal.Rptr. 298].) We take no position on the particular question addressed in those decisions, as it is not presently before us. Defendant does not attack the veracity of Smith, the

citizen-informant herein; on the contrary, he relies on Smith for much of his proposed testimony contradictory of the affidavit.

Nor is any issue raised by defendant's specific claims of omission: he charges, for example, that Detective Gregory failed to recite in his affidavit that the front door of defendant's house was not "fully opened" when the police arrived, the chemical apparatus was not "in plain sight," and the "roach" was not visible on the floor but was brought to the door by Smith. These "omissions," however, are simply negative restatements of positive assertions already attacked by defendant as erroneous. When it is shown that an affiant falsely stated that fact X occurred, the defendant adds nothing to his case by complaining that the affiant "omitted" to state that fact X did *not* occur.

There remains defendant's charge that Detective Gregory deliberately omitted to tell the magistrate that he and Deputy District Attorney Robert King had conducted an unlawful "confirmatory" search of defendant's house before applying for the warrant. Upon close analysis, even this claim fails to present a true case of "omission" within the meaning of *Theodor*. Yet as will appear, the contention does entitle defendant to prove that the subsequent search and seizure of his property under color of the warrant were constitutionally unreasonable.

As noted above, we recognized in *Theodor* the possibility of attacking a search warrant affidavit on the ground that it omitted information "which might otherwise negate a finding of probable cause." (8 Cal.3d at p. 96, fn. 11.) No other kind of omission appears relevant to this inquiry. Under the Constitution and the statutes the sole duty of a magistrate to whom an affidavit for a search warrant has been presented is to determine whether (1) the affidavit is "supported by oath" and (2) the facts alleged therein constitute "probable cause" for issuance of the warrant, and if so, to authorize an appropriately limited intrusion. (Cal. Const., art. I, § 13; U.S. Const., 4th Amend.; Pen. Code, §§ 1525, 1527, 1528.) By negative implication, it is not the magistrate's function also to determine whether the facts alleged in the affidavit were lawfully obtained. Nor would the hearing on an application for a search warrant be a proper forum in which to litigate that question, for at least two reasons: it is not an adversary proceeding, and there is no provision for direct judicial review of an order granting or denying a search warrant on this or any other ground.

The proper forum, of course, is a subsequent motion by the defendant to suppress the evidence seized under the warrant. The court hearing that motion is expressly vested with jurisdiction to resolve any claim that the search warrant was predicated on evidence obtained in "violation of federal or state constitutional standards" (Pen. Code, § 1538.5, subd. (a)(2)(v)), i.e., including the guarantee against unreasonable searches and seizures; and the proceeding is both adversary in nature and subject to immediate judicial review (id., subds. (i), (o)). The People are not required, however, to meet such a claim of illegality before it is raised. Accordingly, at the time the officer-affiant applies for the search warrant he need not include in his affidavit information that is relevant only to the lawfulness of the evidence it recites. ▮ It follows that the omission, whether intentional or unintentional, of such a fact—here, the alleged illegal "confirmatory" search of defendant's house—does not make the affidavit vulnerable to challenge under the rule of *Theodor* and its progeny.[15]

Nevertheless the defendant is not left without a remedy. Although he cannot complain of the omission of this fact from the affidavit, he retains the right to prove the fact itself—i.e., that the "confirmatory" search took place as charged—and to urge that it renders the evidence seized pursuant to the warrant inadmissible under general constitutional principles. There is no procedural bar to such proof: defendant filed a timely motion to suppress on grounds sufficient to include this claim, but was denied the opportunity to introduce his evidence thereof at the hearing.

A substantive barrier exists, however, in the decision of this court in *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418 [96 Cal.Rptr. 455, 487 P.2d 1023]. The facts of *Krauss* are uncomplicated. The defendant was a registered guest at a motel. While cleaning his room, a maid observed what appeared to be an empty cigarette package on a nightstand. Opening it to see if it should be discarded, she found a small plastic bag containing a "green leafy substance." On the basis of experience gained at a drug demonstration class, she believed the substance was marijuana. She reported her discovery to the motel manager, and after inspecting the items the latter called the police.

---

[15]*People* v. *Hill* (1974) 12 Cal.3d 731 [117 Cal.Rptr. 393, 528 P.2d 1], is not to the contrary. There an affidavit for a search warrant *included* certain conversations and admissions by the defendants that the trial court had previously ordered suppressed. Holding that *Theodor* governed in such circumstances, we excised the allegations in question and determined there was ample competent evidence in the remainder of the affidavit to support the magistrate's finding of probable cause. (*Id.*, at pp. 759-761.)

When Sergeant Guevara arrived, the maid and the manager told him they believed there was marijuana in the defendant's room. With the manager's permission the officer entered the room, looked inside the cigarette package and the plastic bag, and examined the contents. He then put the items back on the nightstand as he had found them.

Later that day Sergeant Guevara prepared an affidavit for a search warrant. He related in detail the facts told to him by the maid, but omitted any reference to his warrantless entry and search.[16] A warrant was issued on the strength of this affidavit, and the officer returned to the motel and seized the marijuana he had seen in the cigarette package. The defendant unsuccessfully moved to suppress the evidence on the ground of illegal search and seizure, then sought review by writ of mandate.

The case produced a deep division in this court. The majority of four justices conceded that the defendant had not impliedly consented to motel employees' allowing the police to search his room for contraband, and hence that Sergeant Guevara's warrantless entry for that purpose was illegal. (5 Cal.3d at p. 422.) But the majority nevertheless denied relief. The opinion reasoned, "Before that entry Sergeant Guevara had lawfully acquired information from the motel employees that was sufficient to support the issuance of a search warrant. It was not unlawful for him to use that information to obtain the warrant. The magistrate's independent decision to issue the warrant was in no way tainted by the officer's illegal personal observations, for the magistrate was wholly unaware of such observations." (*Id.,* at pp. 422-423.) The majority concluded that the marijuana seized pursuant to the warrant was not the product of exploitation of the illegality within the meaning of the *Wong Sun* rule, and hence was admissible.

Writing for the three dissenting members of the court, Justice Peters warned that the decision would inevitably have the effect of encouraging law enforcement officers to make a general practice of conducting similar illegal "confirmatory" searches in the future. He found "inescapable" the conclusion that "the search-unlawfully-first-obtain-the-warrant-later procedure would totally undermine the purposes of the exclusionary rule. By holding that a search warrant subsequently obtained on the basis of probable cause insulates the prior unlawful search, the majority provide

---

[16]Although the *Krauss* opinion does not so recite in its statement of facts, its subsequent analysis is premised on the assumption that Sergeant Guevara also omitted any facts learned by him in the course of his search and not already communicated to him by the maid and the manager.

profit for the unlawful search, thus violating the principle of deterrence on which the exclusionary rule is based, and we may expect that many officers will engage in unlawful searches in violation of the constitutional guarantees to determine whether their information is correct or not before seeking a warrant." (*Id.,* at p. 426.)

The record in the case at bar confirms that prediction. Rather than deny that he searched defendant's house without a warrant, Deputy District Attorney King in effect claimed the absolute right to do so under the authority of *Krauss*. At the hearing on defendant's motion to suppress, King argued that an illegal search of the *Krauss* variety is to be distinguished from an "intentional illegality," and implied that it is not only permissible but may even be a commendable police technique. Thus he characterized *Krauss* as approving a warrant based on the observations of a citizen-informer and issued after a warrantless police entry for the purpose of "confirming" those observations; and he concluded, "I contend that is exactly what happened in this case, that *the entry by the police and myself* at the request of the landlord was done, in part, to negate or to support the observations of [the] landlord, and that the facts that are in the search warrant affidavit are only those facts which were lawfully observed either by [the] landlord or the police, in the moments preceding the issuance of the warrant." (Italics added.)[17]

The deputy district attorney's frank admission that he joined the police in conducting a warrantless incursion into defendant's house is nothing less than alarming. If *Krauss* is thus having the effect, as Justice Peters feared, of giving prosecutors and the police both authority and incentive to engage in illegal "confirmatory" searches before applying for warrants, the decision should be reconsidered.

---

[17]We note the deputy district attorney asserted that his entry was merely "in part" for the purpose of confirming the landlord's observations; because he declined to reveal his other motives, we can only infer they were even more improper.

We further note that the quoted language of King created a factual conflict on the question whether allegations of the affidavit were the product of observations made during the prior search of defendant's house: defendant charged they were, while King denied it. Long before *Krauss* it was deemed settled that a search warrant is invalid if it is the product of observations of the police during a previous illegal entry. (*People* v. *Roberts* (1956) *supra,* 47 Cal.2d 374, 377; accord, *People* v. *Carswell* (1959) 51 Cal.2d 602, 606-607 [335 P.2d 99]; *Lohman* v. *Superior Court* (1977) 69 Cal.App.3d 894, 898 [138 Cal.Rptr. 403]; *Raymond* v. *Superior Court* (1971) 19 Cal.App.3d 321, 326-327 [96 Cal.Rptr. 678]; *People* v. *Superior Court (Flynn)* (1969) 275 Cal.App.2d 489, 492 [79 Cal.Rptr. 904].) We could therefore return the case to the trier of fact with directions to resolve this conflict and apply the *Roberts* rule if defendant is found to be correct. But such a disposition would mean that *Krauss* should control if King is correct, and would accordingly imply our continued approval of that decision. For the reasons that follow, we decline to express such approval.

In retrospect, a simpler and more pragmatic approach would better serve the purposes of the constitutional guarantee of the right of the people to be secure in their houses against "unreasonable" searches and seizures. ▮ It is now settled that such a search is "unreasonable" if it is conducted without a warrant: "warrantless searches of a private dwelling are unreasonable per se in the absence of one of a small number of carefully circumscribed exceptions . . . ." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 270 [127 Cal.Rptr. 629, 545 P.2d 1333]; see generally *United States* v. *United States District Court* (1972) 407 U.S. 297, 315-318 [32 L.Ed.2d 752, 765-767, 92 S.Ct. 2125]; *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 474-484 [29 L.Ed.2d 564, 587-594, 91 S.Ct. 2022]; *Katz* v. *United States* (1967) 389 U.S. 347, 356-357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]; *People* v. *Dumas* (1973) *supra,* 9 Cal.3d 871, 879-880; *People* v. *Smith* (1972) 7 Cal.3d 282, 285-286 [101 Cal.Rptr. 893, 496 P.2d 1261].) But the converse is not true: a search conducted under color of a warrant is not "reasonable per se," but may be unreasonable in the constitutional sense on a number of grounds.

▮ To begin with, the search is evidently unreasonable when the warrant does not comply with the basic requirements of the "warrant clause" of the Constitution (see also Pen. Code, § 1525). This is the consequence, for example, when the warrant lacks probable cause because the supporting affidavit relied on hearsay information but failed to state facts showing that the informant both spoke from personal knowledge and was reliable (*Aguilar* v. *Texas* (1964) 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729, 84 S.Ct. 1509]; *Spinelli* v. *United States* (1969) 393 U.S. 410, 413 [21 L.Ed.2d 637, 641-642, 89 S.Ct. 584]; *People* v. *Smith* (1976) *supra,* 17 Cal.3d 845, 850-852; *Alexander* v. *Superior Court* (1973) *supra,* 9 Cal.3d 387, 392-394; *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 892-896 [101 Cal.Rptr. 375, 495 P.2d 1295]), or because the information thus furnished was stale (*Sgro* v. *United States* (1932) 287 U.S. 206, 210-212 [77 L.Ed. 260, 262-264, 53 S.Ct. 138, 85 A.L.R. 108]; *Alexander* v. *Superior Court, supra,* at p. 393 of 9 Cal.3d). As noted above, the search is also unreasonable when the warrant fails to describe with sufficient particularity either the place to be searched (*People* v. *Dumas* (1973) *supra,* 9 Cal.3d 871, 880-881; *Lohman* v. *Superior Court* (1977) *supra,* 69 Cal.App.3d 894, 900-905; *People* v. *Sheehan* (1972) 28 Cal.App.3d 21 [103 Cal.Rptr. 201]) or the person or things to be seized (*Burrows* v. *Superior Court* (1974) *supra,* 13 Cal.3d 238, 249-250; *Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 795-796 [13 Cal.Rptr. 415, 362 P.2d 47]; *People* v. *Tenney* (1972) 25 Cal.App.3d 16, 22-23 [101 Cal.Rptr. 419]).

■ Even if the warrant is legally sufficient in the foregoing respects, the search is also unreasonable when the warrant is executed in an improper manner. This result will follow, for example, when the warrant is served in the nighttime without specific authorization to do so (*Rogers* v. *Superior Court* (1973) 35 Cal.App.3d 716, 719-720 [111 Cal.Rptr. 9]; *Powelson* v. *Superior Court* (1970) 9 Cal.App.3d 357, 362-364 [88 Cal.Rptr. 8]; *Call* v. *Superior Court* (1968) 266 Cal.App.2d 163 [71 Cal.Rptr. 546]; *People* v. *Mills* (1967) 251 Cal.App.2d 420 [59 Cal.Rptr. 489]; Pen. Code, §§ 1529, 1533), or when the police forcibly enter the premises without a timely and adequate announcement of their authority and purpose (*Parsley* v. *Superior Court* (1973) 9 Cal.3d 934, 938-940 [109 Cal.Rptr. 563, 513 P.2d 611]; *People* v. *Hamilton* (1969) 71 Cal.2d 176, 178 [77 Cal.Rptr. 785, 454 P.2d 681]; *People* v. *Benjamin* (1969) 71 Cal.2d 296, 298-299 [78 Cal.Rptr. 510, 455 P.2d 438]; *People* v. *Gastelo* (1967) 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706]; *People* v. *Webb* (1973) 36 Cal.App.3d 460, 465-466 [111 Cal.Rptr. 524]; Pen. Code, § 1531).

■ Finally, even if the warrant is both legally sufficient and properly served, the search is unreasonable when it is excessive in intensity or duration. This defect is apparent, for example, when the search exceeds the precise scope of the intrusion authorized by the warrant (*People* v. *Bracamonte* (1975) 15 Cal.3d 394, 400-401 [124 Cal.Rptr. 528, 540 P.2d 624]), or when it results in the seizure of property which was not specifically described in the warrant and is unrelated to probable criminal activity (*People* v. *Hill* (1974) *supra,* 12 Cal.3d 731, 762-764).

In each of these instances the police have gone through the motions of obtaining a warrant; yet because of a related act or omission by the officers, the ensuing search nevertheless increases the risk of invading innocent privacy and hence is constitutionally unreasonable. The search authorized by *Krauss* increases the same risk, albeit indirectly. After *Krauss,* a police officer need not rely solely on lawfully obtained probable cause; he can instead achieve "certain cause" by conducting an unlawful confirmatory search, thus saving himself the time and trouble of obtaining and executing a warrant if he does not find the evidence. He can safely engage in this conduct because *Krauss* teaches him that if the evidence does turn up in the course of the illegal search, he will still be allowed to seize it later in a second "search" under color of a warrant. The latter prospect thus gives him strong incentive to proceed with the warrantless entry. Yet every time he fails to find the suspected evidence, he has also invaded the privacy of a citizen innocent of any wrongdoing. The second "search" is therefore constitutionally unreasonable because it

significantly contributes to increasing the risk of such invasions of privacy.

■ Insofar as it holds to the contrary, *Krauss* is overruled. But the police will not thereby be deprived of any rights to which they are constitutionally entitled. ■ It has long been settled that an officer who believes he has probable cause to search a house must apply for a warrant rather than take the law into his own hands. (See, e.g., *Johnson* v. *United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 440-441, 68 S.Ct. 367].) If the "neutral and detached magistrate" (*ibid.*) concurs in the officer's belief, the warrant will issue; but if he does not, the proper course is for the officer to renew his investigation and lawfully develop additional facts which will support an inference of probable cause. If he remains unable to do so, it is the Constitution itself which strikes the balance in favor of the citizen's right to privacy. (*People* v. *Cahan* (1955) *supra,* 44 Cal.2d 434, 438-439, 449-450.) As Chief Justice Wright cogently observed in *People* v. *Triggs* (1973) *supra,* 8 Cal.3d 884, 893, "In seeking to honor reasonable expectations of privacy through our application of search and seizure law, we must consider the expectations of the innocent as well as the guilty. When innocent people are subjected to illegal searches . . . their rights are violated even though such searches turn up no evidence of guilt. Save through the deterrent effect of the exclusionary rule there is little courts can do to protect the constitutional right of persons innocent of any crime to be free of unreasonable searches."

■ For the reasons stated herein, we conclude the trial court erred in denying defendant the opportunity to prove his charge that law enforcement authorities had conducted one or more unlawful "confirmatory" searches of his residence before applying for the warrant. Under the foregoing analysis, the critical allegation is not the omission of those searches from the affidavit but the fact that they took place at all. On remand defendant will accordingly be entitled to introduce his proof on the latter issue; and if his assertions in this regard are found to be true, the evidence seized in the subsequent search of his premises under color of warrant will be inadmissible against him.[18]

---

[18]Because official reliance has doubtless been placed heretofore on *Krauss,* the rule we now adopt will, except as to the present defendant, be applicable only to searches conducted after this opinion becomes final. (See *People* v. *Disbrow* (1976) 16 Cal.3d 101, 113, fn. 14 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Ramey* (1976) *supra,* 16 Cal.3d 263, 276, fn. 7.)

In view of the disposition herein, we need not reach defendant's additional contention relating to his motion to withdraw a challenge to the assigned trial judge pursuant to Code of Civil Procedure section 170.6.

The judgment (order granting probation) is reversed.

Bird, C. J., Tobriner, J., Manuel, J., and Newman, J., concurred.

**RICHARDSON, J.**—I concur in the judgment. Substantial, material mistruths of the nature herein alleged justify the quashing of the search warrant without regard to whether the remaining allegations contained in the affidavit are sufficient to demonstrate probable cause.

However, I do not believe that *every* intentional misstatement in an affidavit should so fatally infect the remaining allegations as to render invalid the search warrant in its entirety. No deliberate falsehoods can ever be condoned, but where they occur in the law enforcement process and pertain to insubstantial, immaterial, or wholly collateral matters and do not raise reasonable doubt as to the truth of the remainder of the affiant's assertions, I would not punish the People by invalidating the warrant; rather, I would leave to criminal sanction or to appropriate internal law enforcement administration the necessary discipline for those who have intentionally falsified.

By way of illustration, in the present case Detective Gregory's affidavit recited that rental manager Smith told Gregory that he went to defendant's house *to evict him* for nonpayment of rent. Defendant's investigator, West, interviewed Smith, however, and was told that Smith went to defendant's house *to collect past due rent.* Assuming for purpose of argument that Gregory for some unknown reason intentionally misstated the facts in this regard, no one has suggested that such misrepresentation should void the warrant. The majority opinion, nevertheless, indicates that *every* intentional mistruth would so operate, regardless of the materiality on the issue of probable cause. (See *ante,* p. 89.)

In my view this position is too extreme. I would forego application of such a strict per se treatment in favor of a rule of reason, at least as to mistruths regarding collateral matters which are not pertinent to the issue of probable cause.

**CLARK, J.,** Dissenting.—The fundamental question presented is, of course, whether evidence obtained pursuant to a warrant issued in reliance on an affidavit containing deliberately false statements of

fact—lies—must be excluded, regardless of the effect of those lies on probable cause.

Assuming that the remedy fashioned by this court in *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234] is the only alternative, the majority conclude that such evidence must be excluded. The *Theodor* remedy of course calls for excising the false allegations from the affidavit and then testing the remaining—presumably truthful—allegations for probable cause. (8 Cal.3d at pp. 100-101.) This remedy is inadequate when lies, rather than negligent misrepresentations, are involved, the majority note, because in such a case the remaining allegations cannot be presumed truthful. Had the magistrate known that the affiant was lying in making certain allegations, he might well have disbelieved some or all of the affiant's remaining allegations. (*Ante,* pp. 86-87.)

Granted. Mere excision is, for the reason stated, an inadequate remedy for lies. However, this deficiency can easily be cured by holding that the judge conducting the *Theodor* hearing is to entirely reweigh the affiant's credibility if he is found to have lied in part. That is, upon finding that the affiant lied in making the challenged allegations, the judge, bearing in mind the doctrine expressed in the maxim *"falsus in uno, falsus in omnibus"* (*ante,* p. 86), should be required to reweigh the affiant's remaining allegations, *testing for probable cause only those allegations—if any—he finds to be true.* If allegations providing probable cause survive this scrutiny, the warrant should be upheld.[1]

A possible objection to this proposal is that reweighing credibility is the one thing a reviewing court has no business doing. The answer to this objection is, of course, that reweighing credibility is the very endeavor upon which the superior court embarks in conducting a *Theodor* hearing into the question whether the affiant lied in making the challenged allegations. Having the affiant before it, having determined that certain of his allegations were lies, and having parties before it interested in

---

[1]That this remedy is more than adequate to pass constitutional muster is confirmed by the high court's recent decision in *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674], discussed *ante,* page 88. There is, of course, absolutely no reason to believe that the draftsmen of article I, section 13 of the California Constitution intended to provide a criminal defendant greater protection in this respect than did the draftsmen of the Fourth Amendment to the United States Constitution. (See, e.g., *People* v. *Maher* (1976) 17 Cal.3d 196, 204 [130 Cal. Rptr. 508, 550 P.2d 1044] (Clark, J., dis.); *People* v. *Pettingill* (1978) 21 Cal.3d 231, 252-254 [145 Cal.Rptr. 861, 578 P.2d 108] (Clark, J., dis.).)

attacking or supporting his credibility as to the remaining allegations, the superior court is clearly in a better position than was the magistrate to assess credibility and then, depending upon that assessment, to determine probable cause.

Another objection, raised by the majority *(ante,* pp. 87-88), is that automatic exclusion of evidence obtained under the warrant is the only effective means of deterring lying in an affidavit in support of a search warrant. However, a police officer found by the superior court to have not merely "blundered" but to have deliberately lied under oath in preparing a search warrant affidavit is clearly subject to prosecution for perjury *(ante,* pp. 87-88) and to administrative discipline commensurate with the extreme gravity of his misconduct. Surely it is obvious that an officer contemplating perjury is much more likely to be deterred by a sanction penalizing him personally, possibly resulting in imprisonment and the end of his career, than by a sanction indiscriminately penalizing all law-abiding citizens by letting a criminal go free.

A related objection, also raised by the majority *(ante,* p. 87, fn. 10), is that, as a matter of purported fact, the guilty officer is not likely to be either criminally prosecuted or administratively disciplined. This objection not only manifests a curious cynicism concerning the rule of law in our society, but also underestimates the moral force of this court. If we were to make it unmistakably clear in this case that a police officer found by the superior court to have lied under oath should be prosecuted for perjury, and that the Attorney General is obligated to uphold the law if for any reason the local prosecutor fails to do so (Cal. Const., art. V, § 13; Gov. Code, § 12550), I am confident justice would be done.[2]

I would reverse the judgment and remand the case for proceedings consistent with this opinion.

.Respondent's petition for a rehearing was denied October 18, 1978. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

---

[2]Consider the spot the district attorney, an elected official, would be in. The superior court, having found that the officer lied under oath, would expect prosecution to follow. The defense bar would blow the whistle on any dereliction of duty. "Investigative reporters" and organized groups of interested citizens would make the political price of such dereliction too costly.