The **STATE** of Ohio, Appellee,

v.

**BOOKER,** Appellant.

[Cite as *State v. Booker* (1989), 63 Ohio App.3d 459.]

Court of Appeals of Ohio,
Montgomery County.

No. 11244.

Decided June 30, 1989.

*Lee C. Falke,* Prosecuting Attorney, and *Walter F. Ruf,* Assistant Prosecuting Attorney, appellate division, for appellee.

*Daniel J. O'Brien,* for appellant.

FAIN, Judge.

Defendant-appellant Gene Booker appeals from his conviction and sentence for aggravated trafficking (possession of more than three times the bulk amount) in heroin. Booker contends that he was deprived of the effective assistance of counsel as a result of a conflict of interest in his trial counsel's joint representation of both Booker and his common-law wife, Jimmie Booker. Booker also contends that the trial court erred by denying, without a hearing, his motion to suppress evidence obtained pursuant to a search warrant.

Booker's motion to suppress was based upon an allegation that the police officer who gave the affidavit in support of the search warrant lied concerning some of the averments in his affidavit.

We conclude that even if the averments in the affidavit offered by Booker in support of his motion to suppress are fully credited, the most that those averments establish is that the police officer may have lied, in his affidavit offered in support of a search warrant, when the police officer averred that the informant had given police officers reliable information in the past. We conclude that the affidavit offered in support of the search warrant, even when it is considered without the averments concerning the informant's prior history of reliability, is sufficient to show probable cause for the issuance of the warrant.

Accordingly, we conclude that the trial court was within its discretion in denying, without a hearing, the motion to suppress the evidence obtained as a result of the execution of the search warrant.

With respect to Booker's claim that he was deprived of the effective assistance of counsel as a result of a conflict of interest in his trial counsel's joint representation of both Booker and his wife, we conclude that any determination of whether Booker may have been prejudiced as a result of joint representation, as well as any determination of whether Booker waived his rights in this regard, as alleged by his trial attorney at sentencing, cannot be determined on direct appeal, because those determinations necessarily depend upon matters outside the record.

Because we reject both of Booker's assignments of error, his conviction and sentence will be affirmed.

I

In February 1986, James Green had been arrested for theft and for possession of drugs. Police officers offered to drop the charges against Green in exchange for his cooperation in the investigation of Booker. Green agreed to this proposition.

On February 5, 1986, Detective Roger Rockwell of the Dayton Police Special Investigative Unit, who was working with the federal narcotics task force, met Green in the basement of the Dayton Federal Building. Rockwell arranged with Green to purchase narcotics at the Booker residence. Green was strip-searched, revealing no controlled substances on his person. After the strip-search, Green was given money for the purchase, and was escorted to a car in the parking lot of the Federal Building for his use in driving to the Booker residence to make the purchase.

Special Agent Theodore Almay of the Ohio Bureau of Criminal Investigation, testified that he and two police officers searched the car, which was provided by the West Carrollton Police Department, in the parking lot of the Federal Building before Green's use of the car.

There was testimony that three cars containing law enforcement officers followed Green to the Booker residence at 526 Liscum in Dayton, after Green left the Federal Building parking lot to make the purchase. There was testimony that Green remained in view of police officers at all times from his departure from the parking lot until his arrival at 526 Liscum, including his exiting the car and entering the house. Green entered the house at about 1:35 p.m. and left at about 1:50 p.m. Green got into the car that had been supplied to him, and drove directly back to the Dayton Federal Building. When Green arrived in the Federal Building parking lot, he immediately exited the car, approached one of the police officers, and gave him a red balloon tied in a knot.

The contents of the red balloon were tested at the Miami Valley Regional Crime Lab, and were determined to consist of 2.72 grams of a brown powder containing heroin.

On February 10, 1986, Detective Rockwell applied to the Honorable Jack D. Duncan, a judge of the Dayton Municipal Court, for a search warrant authorizing a search of the premises at 526 Liscum Drive, and of the Bookers' persons. Rockwell's affidavit in support of his application for the search warrant is appended to this opinion. In the first paragraph of Rockwell's affidavit, he averred that a "confidential and reliable informant" had stated that Gene and Jimmie Booker are and have been selling heroin from 526 Liscum Drive on a continuous basis. The first paragraph of Rockwell's affidavit went on to aver, as follows:

"A. The informant knows this to be true as he/she has purchased heroin from Gene Booker and Jimmie Booker at 526 Liscum Drive.

"B. This informant has provided criminal information which has been proved accurate and true through independent investigation."

The second paragraph of Rockwell's affidavit outlined the arranged purchase by Green (without identifying him) on February 5, 1986, including the fact that Green was searched before going to make the buy, that Green remained within the visual contact of Rockwell and other police officers while going to and coming from 526 Liscum Drive, and that, upon the pre-arranged rendezvous, Green gave the police officer a red balloon containing suspected heroin.

The third paragraph in Rockwell's affidavit averred that the Miami Valley Regional Crime Laboratory had tested the suspected heroin and determined that it did, indeed, contain heroin.

The fourth paragraph of Rockwell's affidavit averred that Rockwell had made a record check on the Bookers, and had determined that Gene Booker had been arrested on narcotics violations on two previous occasions, and that Jimmie Booker had previously been arrested for grand theft, falsification, and assault with a deadly weapon.

A search warrant was issued and was executed at 7:50 p.m. on the evening of February 12, 1986, resulting in the obtaining of a great deal of probative evidence.

The Bookers were both indicted for aggravated trafficking (possession of more than three times the bulk amount) in heroin. Jimmie Booker, but not Gene Booker, was indicted for the sale of a controlled substance, based on her sale to Green. Green's testimony was that he purchased the heroin from Jimmie Booker.

Two and a half years after their indictment, the Bookers were brought to trial. At all times, they were represented by the same defense counsel. They both waived their right to trial by jury.

During the trial, the Bookers filed a motion to suppress the evidence obtained as a result of the execution of the search warrant, upon the ground that the affidavit upon which the search warrant was based was defective. Initially, the trial court denied the motion to suppress upon the grounds that it was not timely filed. Subsequently, the trial court indicated, on the record, that it was aware of the fact that it had discretion whether to conduct a hearing on the motion to suppress, even though it was not timely filed, "in the interests of justice," but that it was exercising its discretion not to do so.

Following the bench trial, Booker was found guilty as charged. At sentencing, for the first time, Booker contended that there was an inherent conflict of interest in the representation of both himself and Mrs. Booker, as a result of which he had not had a fair trial. At that time, the Bookers' trial counsel made the following statement:

" * * * I suppose in counsel's own defense, the matter of conflict of interest was discussed with Mr. Booker and Mrs. Booker at the outset of this case in 1986. I pointed out to them that under some circumstances that there might be a conflict, however, according to what they were telling me at that time and the story which they carried through this case, there was no conflict; however, I told them that if they wished to seek separate counsel, they ought to do so. I reiterated that right again before trial; and as the court knows,

having tried this case, neither defendant testified. I don't believe that there was a conflict of interest, however, I did point out that possibility to them very, very long ago. * * * "

From his conviction and sentence, Booker appeals.

## II

Booker's first assignment of error is as follows:

"The appellant was denied due process under the federal and Ohio Constitutions because of the joint representation by single counsel of Jimmie and Gene Booker actively created a conflict of interest and that actual conflict of interest adversely affected his attorney's performance and each defendant's individual rights."

Booker contends that he was deprived of the effective assistance of counsel as a result of a conflict of interest in the joint representation of Mrs. Booker and himself. Booker alleges five ways in which he was prejudiced as a result of this conflict of interest.

First, Booker contends that he was prejudiced because his attorney had advised him that he could arrange for his wife's release, but he could not do the same for Booker because of a detainer outstanding against him. Booker does not say, nor is it apparent, how this problem could have been alleviated by the Bookers' having been separately represented by counsel.

Second, Booker contends that "the approach necessary for a successful defense" was necessarily different in each case because the crimes for which he and his wife were charged differed in the core element necessary to prove guilt. In this regard, he notes that only his wife was charged with knowingly selling heroin.

Third, Booker contends that because the possession case was based solely upon circumstantial evidence, it was important for each defendant to testify in his own defense, but that, in a joint trial with one attorney, neither could take the stand, since "it might require that the testimony [of each] could or would inculpate the other."

We conclude that Booker's second and third theories of prejudice, taken together, essentially argue that it was in his interest to point the finger at his wife as being the real offender, with himself as an innocent resident of the house in which drugs were being distributed. The strategy actually pursued by the Bookers appears to have been intended mainly to discredit the witness, Green.

While there may be cases in which it would be a sound strategy to seek to pin the blame exclusively on a co-defendant, the history of criminal jurispru-

dence is replete with instances in which attempts by co-defendants, whether or not they are tried jointly, to pin the blame on each other have simply resulted in the mutual destruction of the credibility of each defendant to the detriment of both.

It is not possible in this case to determine whether the Bookers were actually prejudiced by the adoption of an unsound trial strategy as a result of conflicts of interest inherent in their joint representation, without going outside the record. For example, Booker contends that had he taken the stand, he could have sought to pin the blame on his wife. This presupposes that he could have testified truthfully to that effect, but that is a determination that cannot be made upon this record.

Booker's fourth theory of prejudice is that he should have received separate legal advice concerning whether to waive a jury. He argues that he was the victim of adverse inferences concerning whether the drugs found at the home were knowingly possessed, in view of the fact that there was evidence that his wife sold drugs at the home. We fail to see, however, that a jury, had Booker exercised his right to a jury, would have been any less likely to have drawn that inference than the trial judge. We also fail to see that that inference would have been any less likely to have been drawn had Booker's trial been separate from that of his wife. Booker does not argue that evidence of the sale of heroin at the residence, by his wife, would have been irrelevant to the issue of his knowing possession of the heroin found at the residence.

Booker's fifth theory of prejudice is "the failure to attempt plea bargaining on behalf of [Booker]." Again, it is not possible to determine whether there was a failure to attempt plea bargaining on Booker's behalf, or, if there was such a failure, whether there was any realistic possibility that Booker could have obtained a better deal as a result of a plea bargain, without going into matters outside this record.

Finally, the state contends that Booker waived any right to separate representation. The state bases this argument upon the statement made by Booker's trial counsel at sentencing, after Booker had raised the issue of a conflict of interest inherent in the joint representation. In this regard, Booker says in his brief: "Gene Booker states that this is not true and will swear to it." This simply highlights that the issue of whether Booker consented to the joint representation, and waived any right that he may have had to separate representation, is not an issue that can be determined from the record on direct appeal.

Co-defendants are often confronted with the dilemma that while either one of them, individually, may be better off as a result of deciding to cooperate with the authorities and to inculpate the other, they may both be better off if

they both decide not to do so. This is even the subject of a game known to both mathematicians and game theorists as "Prisoner's Dilemma." See Douglas R. Hofstadter, "Metamathemagical Themas," *Scientific American,* Vol. 248, Issue 5, May 1983, at 16–26. In seeking to increase the likelihood that each co-defendant will resist the temptation to "rat" on the other, it may be an entirely rational strategy to agree to joint representation by a single attorney, since that may minimize the temptation to which either co-defendant may be exposed. It is, therefore, plausible that Booker may have agreed to a joint representation, and may have waived his right to separate representation, even though there were real conflicts of interest inherent in the representation.

■ Where allegations of ineffective assistance of counsel require for their determination consideration of facts not appearing in the record, the appropriate remedy is through a petition for post-conviction relief, pursuant to R.C. 2953.21, and not through direct appeal. *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 4 OBR 580, 448 N.E.2d 452. We conclude that Booker's claim that the conflict of interest inherent in his joint representation, with his wife, by a single trial attorney, deprived him of his right to effective assistance of counsel, and that he did not knowingly waive this right, cannot be determined in a direct appeal, because it necessarily involves the consideration of facts that are not in this record. Accordingly, Booker's first assignment of error is overruled, without prejudice to any remedy that he may have pursuant to R.C. 2953.21.

### III

■ Booker's second assignment of error is as follows:

"The trial court erred in denying defendant-appellant's motion to suppress all evidence obtained pursuant to the search warrant as untimely and such denial manifested judicial error which defeated justice."

During trial, Booker moved to suppress the evidence obtained as a result of the execution of the search warrant. In support of his motion, Booker presented the affidavit of James Green, who had been identified at trial as the anonymous informant referred to in the search warrant affidavit. In his affidavit, Green averred that he had never provided any law enforcement officer with any information concerning any criminal investigation before he agreed to make the purchase of heroin at the Booker residence. This averment contradicts the averment in Detective Rockwell's affidavit that: "This informant has provided criminal information which has been proved accurate and true through independent investigation."

Initially, the trial court simply denied Booker's motion to suppress as being untimely. Subsequently, however, just before announcing his decision on the merits of the case, the trial judge returned to the suppression issue. He noted that he had discretion under Crim.R. 12 to consider the motion to suppress, even though it was not timely filed, "for good cause shown," which the trial court presumed to be "in the interest of justice."

The trial court then proceeded to indicate its reasoning in deciding to exercise its discretion not to grant relief from the waiver. The trial court noted that it, as the fact finder in this bench trial, had heard the testimony of the officers, and Green's testimony, concerning the facts to which Detective Rockwell's affidavit related. The trial court noted that everything to which Green had testified in the case had been verified except that he did not see the police officers following him, and he did not see the car provided for his use being searched, as the officers had averred. The trial court found that the mere fact that he did not see the police officers following him did not necessarily make Green a liar in that regard, because he might simply not have observed the officers following him. The trial court also noted that it was entirely possible that the car provided for his use was searched when Green was not present. This would have been consistent with both Green's testimony and Rockwell's affidavit.

In essence, the trial court found that even if Rockwell had been lying when he averred that Green had provided criminal information in the past which had been proved accurate and true through independent investigation, that was not material to the issuance of the search warrant, since Green's testimony in the case appeared to be accurate.

In *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, a case upon which Booker relies for this assignment of error, the Supreme Court held that evidence must be excluded if it is obtained through the execution of a search warrant that is based on an affidavit containing deliberate misstatements of fact, if those misstatements are essential to the determination of probable cause to search. In *Franks*, the Supreme Court held that the matters alleged to have been deliberately misstated in the supporting affidavit were essential to the determination of probable cause, in that probable cause could not reasonably have been found without the deliberately misstated facts. In summarizing the holding, however, the court made the following statement at 438 U.S. at 171–172, 98 S.Ct. at 2684, 57 L.Ed.2d at 682:

" * * * Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there

remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." (Footnote omitted.)

In the footnote to the above statement, the Supreme Court noted that the petitioner had conceded that "if what is left is sufficient to sustain probable cause, the inaccuracies are irrelevant." Thus, the above-quoted statement is dictum, and appears to have been based upon the petitioner's concession in that case, rather than upon any reasoning expressed in the opinion. Nevertheless, the statement has been followed in a number of the federal circuit courts of appeals. See 2 LaFave Search and Seizure (2 Ed. 1987), Section 4.4(c), at 196–198, and the cases cited in footnotes 48 and 52. Although LaFave is critical of this result, the only cases that he cites for the proposition that a deliberate misstatement in an affidavit will be grounds for exclusion of evidence obtained as a result of a search warrant issued on the basis of the affidavit, regardless of the materiality of the deliberate misrepresentation, are state courts grounding their position on state law. *People v. Cook* (1978), 22 Cal.3d 67, 148 Cal.Rptr. 605, 583 P.2d 130; *State v. Caldwell* (La.1980), 384 So.2d 431.

██ It is clear from *State v. Mapp* (1960), 170 Ohio St. 427, 11 O.O.2d 169, 166 N.E.2d 387, reversed *sub nom. Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, especially considering Justice Herbert's dissenting opinion at 170 Ohio St. at 434–438, 11 O.O.2d at 173–175, 166 N.E.2d at 391–394, that Ohio has never recognized an exclusionary rule for violations of its constitutional restrictions on searches and seizures (Section 14, Article I, Ohio Constitution).

In the case before us, Booker contends that Detective Rockwell lied when he averred, in his affidavit in support of his application for a search warrant, that the informant, Green, had provided criminal information which had been proved accurate and true in the past. In many instances, an averment concerning the reliability of an anonymous informant will be essential to a probable cause determination. However, in this case, we conclude that it was not essential. In the balance of his affidavit, Rockwell averred that the informant had been strip-searched before being sent to make the purchase, and that the car provided for his use had been searched beforehand. To be sure, the informant, Green, averred in his affidavit in support of the motion to suppress that he did not see the officers search the car, but that is not inconsistent with the testimony, at trial, that the car was searched before it was made available to Green.

In his affidavit, Rockwell also averred that the informant, Green, remained within Rockwell's "visual contact" while going to and coming from the residence at 526 Liscum Drive, and that upon leaving 526 Liscum Drive, "the

informant was observed to travel to a pre-arranged location, where he/she handed a red balloon of suspected heroin to [police officers]." Rockwell further averred that the suspected heroin was tested by the Miami Valley Regional Crime Laboratory, and was determined to contain heroin. Finally, Rockwell averred that he was advised by the "Records Section" that Booker had been arrested on narcotics violation on two previous occasions.

The balance of Rockwell's affidavit, even when the averment concerning the informant's past reliability is completely disregarded, is, in our opinion, sufficient to establish probable cause to search the premises at 526 Liscum Drive.

Accordingly, the affidavit of Green offered by Booker in support of his motion to suppress was insufficient, even if entirely true, to sustain a motion to suppress. Therefore, the trial court did not err in exercising its discretion not to entertain the untimely motion to suppress.

Booker's second assignment of error is overruled.

### IV

All of Booker's assignments of error having been overruled, his conviction and sentence will be affirmed.

*Judgment affirmed.*

BROGAN and WILSON, JJ., concur.

### APPENDIX

1. On February 5, 1986, the affiant was introduced to a confidential and reliable informant by Sgt. Dave Walters, Springfield Police Department, Springfield, OH. The confidential and reliable informant stated that Gene Booker, AKA "Tom Peck" and Jimmie Booker are and have been selling heroin from 526 Liscum Drive, Dayton, OH, on a continuous basis.

    A. The informant knows this to be true as he/she has purchased heroin from Gene Booker and Jimmie Booker at 526 Liscum Drive.

**470**

B. This informant has provided criminal information which has been proved accurate and true through independent investigation.

2. Cn or about February 5, 1986, the informant mentioned in paragraph one, went to 526 Liscum Dr., while being observed by the affiant, Special Agent Ted Almay of the Bureau of Criminal Investigation, Sgt. Dave Walters, Det. Sonny Windom, and Det. Doug Estep of the Springfield Police Department, and Det. Brian Fields of the West Carrollton Police Department, and purchased a quantity of suspected heroin from Jimmie Booker.

A. Prior to going to 526 Liscum Drive, the informant was searched by the affiant and no controlled substances were found.

B. The informant remained within visual contact of the affiant, or one of the other detectives mentioned in paragraph two, while going to and coming from 526 Liscum Drive.

Upon leaving 526 Liscum Drive, the informant was observed to travel to a pre-arranged location, where he/she handed a red ballon of suspected heroin to Sgt. Dave Walters, and Sgt. Walters handed the suspected heroin to the affiant.

3. On February 7, 1986, the affiant, contacted the Miami Valley Regional Crime Laboratory, who analyzed the suspected heroin and advised the test was positive for heroin.

4. On February 9, 1986, the affiant made a record check on Gene E. Booker, SSN 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, and Jimmie D. Booker, SSN: 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. Records Section advised the affiant that Gene E. Booker has been arrested on narcotics violations on two previous occasions. Records indicated that Jimmie D. Booker has previously been arrested for Grand Theft, Falsification, and Assault with a Deadly Weapon.

5. Further the deponent saith not.