OPINION
This is an appeal by defendant, Tequila R. White, from a judgment of the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of aggravated robbery, assault and theft.
On August 21, 1997, defendant was indicted on one count of aggravated robbery, in violation of R.C. 2911.01, one count of felonious assault, in violation of R.C. 2903.11, and one count of theft in violation of R.C. 2913.02. The indictment arose out of an incident on May 9, 1997, in which Celia King was assaulted in an apartment building on Madison Avenue.
On that date, King went to visit Elaine Reed, who resides at 1377 Madison Avenue. King's roommate, William Callahan, and King's five-year-old son, Benjamin, accompanied her to Reed's apartment.
King gave the following testimony regarding the incident on May 9, 1997. Earlier that day, King had spoken with Reed at a food stamp office, where King had picked up her monthly allocation of food stamps. Reed invited King to her apartment to visit so that their children could play together. After arriving at Reed's apartment, King spoke with Reed for about twenty minutes, at which time Reed indicated that she needed to go next door to make a phone call. Reed returned shortly thereafter, and King told her that she was going to pick up her seven-year-old son, Stephen, and bring him over to play with Reed's children.
As King walked out of Reed's apartment, she noticed a teenage girl standing in the hall with a basket of clothes. King was the first person to leave the apartment and, as she started walking down the stairs, a girl jumped on her. The girl started to punch King. King told Callahan to get her son, and Callahan pulled Benjamin away from the scene and started calling for Reed. King bent over and the girl flipped over and fell in the stairway. King then tried to get to the bottom of the steps. King saw another girl standing at the bottom of the stairs; this girl approached King and also started to attack her.
King tried to reach for a door but the defendant then appeared and shut the door. King again tried to open the door but the defendant grabbed her. King then bit down on the defendant's hand. King and the defendant then started to fight. The defendant picked up a beer bottle and hit King twice around the head area. The defendant tried to hit her again, and King put up her arm to deflect the blow. The bottle fell to the ground and one of the other assailants picked it up and started to hit King.
The defendant said to King, "Bitch, just let go of the purse, just let go of the purse. I'm kicking your ass today. I'm kicking your ass." (Tr. Vol. I, 146.) King fought her way back up the steps but as she neared the top she slipped and her purse rolled away. One of the assailants, named Fateka, picked up the purse and "ran into the house." (Tr. Vol. I, 147.) The defendant then said, "bitch, we got your keys. We got your pocketbook. We got all your food stamps and all your money." (Tr. Vol. I, 147.)
King knocked on Reed's door and Reed let her in the apartment. King told her son to stay at the apartment. King then jumped out the window and ran down the street. She saw a man in a car and told the man she needed to use his phone. The man said that he had seen her running and that he had called the police. King was subsequently taken to the hospital and was treated for head injuries and a broken bone in her left hand.
Fateka Shotwell is the cousin of the defendant. Shotwell was arrested and charged with aggravated robbery and felonious assault as a result of the incident involving King. At trial, Shotwell acknowledged that she assaulted King on May 9, 1997. Shotwell punched King and grabbed for her purse during the incident. A police detective interviewed Shotwell at the time of her arrest, but Shotwell did not mention the defendant's name in connection with the incident. Shotwell testified that she lied to the detective about her involvement as well as the defendant's involvement.
Shotwell gave the following account of the incident. On May 9, Shotwell was coming out of her apartment, at 1371 Madison Avenue, when she saw Celia King. King was looking for Elaine Reed. Shotwell informed her that Reed was in Shotwell's apartment using the telephone. Reed's apartment was located directly across the hall from Shotwell's apartment. The defendant's apartment was next door to Shotwell's apartment.
Reed eventually left Shotwell's apartment, and Shotwell went over to the defendant's apartment. A short time later, Reed stopped by and asked the defendant if she knew where to get some drugs. Reed indicated that "Anne want to know." (Tr. Vol. II, 23.) The defendant asked if "she got some money." (Tr. Vol. II, 23.) Reed stated, "[s]he got $300." (Tr. Vol. II, 23.) The defendant then said, "[w]ell, she's not getting nothing because she owe me some money." (Tr. Vol. II, 23.)
Shotwell and another individual, seventeen-year-old Monique Alston, then walked out of the apartment. While Shotwell was upstairs, Alston stood downstairs by the security door. When King came out of Reed's apartment, Alston and Shotwell assaulted King by punching her. King dropped her wallet and Shotwell picked it up. The defendant took the wallet "out of my hands." (Tr. Vol. II, 24.) During the incident, the defendant and Alston both hit King with a bottle. The defendant hit King "kind of hard" on top of the head with the bottle. (Tr. Vol. II, 25.) The defendant struck King more than once with the bottle.
After the assault, Shotwell, Alston and the defendant went back into Shotwell's apartment. The defendant took the money out of King's purse and gave Shotwell $40 and Alston $40. The defendant kept the rest of the money.
The defendant testified on her own behalf. The defendant gave the following testimony regarding the events on May 9. On that date her cousin, Fateka Shotwell, asked her if she would watch her children. The defendant and her boyfriend, Reico Henderson, went over to Shotwell's apartment to get her children. Elaine Reed was using the phone at the time. The defendant heard her say, "[s]he don't have that much money." (Tr. Vol. II, 213.) They returned to defendant's apartment, but the defendant remembered that she had to phone her grandmother.
The defendant and Henderson then went back to Shotwell's apartment. Shotwell was coming out the door as the defendant arrived. Shotwell indicated that she would be right back. When the defendant started using the phone, she heard "banging" outside the hallway. (Tr. Vol. II, 214.) The defendant then heard Shotwell hollering, "Bitch, where is the bitch at." (Tr. Vol. II, 217.)
The defendant ran outside and saw Shotwell fighting with King at the bottom of the stairs. A girl named Monique was also there. The defendant stated that her intention was to "break it up." (Tr. Vol. II, 217.) The defendant saw "swings coming from all sides." (Tr. Vol. II, 217.) The defendant tried to grab both King and Shotwell. King grabbed the defendant's finger and the defendant told her to let go. When King did not let go, the defendant "punched her in the mouth." (Tr. Vol. II, 219.)
The defendant then started pushing King up the steps when "a wallet fell." (Tr. Vol. II, 223.) Shotwell grabbed the wallet and ran into her apartment. Reed went in behind her and the defendant then followed. The defendant stated that "[b]y the time I entered Fateka's house, I don't know what they had done or whatever. But I never seen the wallet no more after that." (Tr. Vol. II, 224.) The defendant grabbed her coat and went home. The defendant stated that Shotwell came over to her apartment later and explained that "the plan was Elaine was trying to buy drugs for Anne. The dude was charging too much money. So Elaine had said, `Fuck the bitch. She not giving me shit. Anyway I am going to take her money.'" (Tr. Vol. II, 226.)
The jury returned verdicts finding defendant guilty of aggravated robbery, assault and theft. The trial court sentenced defendant by entry filed October 6, 1998. Specifically, the court sentenced defendant to three years incarceration at the Ohio Reformatory for Women in Marysville on Count One and six months on Count Three, to be served concurrently with each other, and six months incarceration at the Franklin County Correction Center on Count Two, to be served concurrently with Counts One and Three.
On appeal, defendant sets forth the following two assignments of error for review:
ASSIGNMENT OF ERROR I
 DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
ASSIGNMENT OF ERROR II
 THE TRIAL COURT ERRED WHEN IT ENTERED A JUDGMENT OF CONVICTION AND SENTENCED DEFENDANT ON ALLIED OFFENSES OF SIMILAR IMPORT IN VIOLATION OF R.C. 2941.25 AND IN VIOLATION OF THE STATE AND FEDERAL PROHIBITIONS AGAINST THE IMPOSTION OF MULTIPLE PUNISHMENTS.
Under the first assignment of error, defendant asserts that she was denied effective assistance of counsel. Specifically, defendant argues that her trial counsel was ineffective in failing to make a proper proffer as to what the testimony of a witness, Monique Alston, would have been.
The record indicates that during the state's case in chief, defense counsel asked for a mistrial on the grounds that counsel had been "informed that in the event that I call a certain witness, she will be arrested." (Tr. Vol. II, 18.) Defense counsel stated that Alston's name had been provided in discovery, and that "they have now had almost a year to arrest this woman if they wanted to." (Tr. Vol. II, 18.)
In response, the prosecutor indicated that he was unaware as to "[w]hat investigation the police have done" or "what the police have done in regard to securing her arrest." (Tr. Vol. II, 19.) The prosecutor further stated that he was "not threatening to arrest her if she takes the stand," but that "[s]he needs a lawyer to advise her if she makes a statement, it could be used against her." (Tr. Vol. II, 21.) The trial court overruled defense counsel's motion for a mistrial.
Later, during defendant's case in chief, defense counsel made the following proffer:
 I would now proffer for the record that I would have been calling Monique Alston at this point in time on behalf of Miss White. However, when I made that known to the State of Ohio a few days ago, I believe it was Thursday of last week, I am not going to swear to that, at that point in time, they informed me that they would now be filing charges against her this incident. And it was their intention at that point in time to — although it is my understanding now it is a summons not arrest her. Based upon the state's actions at approximately 15 months after the event, they have foreclosed my ability to call that witness because she's now been advised by counsel not to testify.
 I cannot place her on the stand at this point because she would take the Fifth Amendment at this point. (Tr. Vol. II, 209.)
The prosecutor then stated the following in response to defense counsel's proffer:
 * * * Your Honor, when I understood that Monique was going to be called, I suggested that she have a lawyer give her some advice on her constitutional rights. Based on that, I believe she's been advised of her rights. I have no intent to arrest her today. However, she probably will be interviewed pursuant to summons. And it wasn't I who foreclosed that situation. The Fifth Amendment of the Constitution foreclosed that situation. And that should be perfectly clear. (Tr. Vol. II, 210.)
The trial judge then noted that "I placed on the record that and the events leading up to my asking the Public Defender and then defense Attorney Charles Smith to * * * speak with her. And Mr. Smith reported that she would not be testifying because she would take the Fifth Amendment." (Tr. Vol. II, 210.)
Defendant argues that, although trial counsel did proffer some information for the record, such proffer was "fundamentally deficient" in that it failed to enter into the record what the testimony of the witness would have been. Defendant also contends that trial counsel should have sought the admission of the statements of Alston "through another witness."
The state argues in its brief that defendant has raised matters outside the record and that it is "just as likely that counsel failed to proffer [Alston's] * * * testimony because he did not know what she would say." The state further argues that, although defendant suggests that his counsel should have introduced Alston's statements through other witnesses, there is nothing in the record to show that Alston made any statements. We note that defendant acknowledges that this court, on the state of the record before us, cannot determine whether prejudicial error occurred absent a supplemental record. Defendant suggests that this court remand this matter "for the purpose of holding an evidentiary hearing on the issue."
In State v. Cooperrider (1983), 4 Ohio St.3d 226, the court discussed the proper procedure where, on direct appeal, a defendant raises issue outside the record. Specifically, the court held:
 It may be in that the present case appellant can allege sufficient facts to state a claim of ineffective assistance of counsel. However, it is impossible to determine whether the attorney was ineffective in his representation of appellant where the allegations of ineffectiveness are based on facts not appearing in the record. For such cases, the General Assembly has provided a procedure whereby appellant can present evidence of his counsel's ineffectiveness. This procedure is through the post-conviction remedies of R.C. 2953.21. This court has previously stated that when the trial court record does not contain sufficient evidence regarding the issue of competency of counsel, an evidentiary hearing is required to determine the allegation. * * * Cooperrider, supra, at 228. (Citation omitted.)
See, also, State v. Demmons (Feb. 13, 1998), Clark App. No. 97-CA-52, unreported ("The law is well-settled that when allegations of ineffective assistance of counsel hinge on facts not appearing in the record, the proper remedy is a petition for post-conviction relief rather than direct appeal"), citing Statev. Booker (1989), 63 Ohio App.3d 459, 466, and Cooperrider,supra.
Because a determination of defendant's claim of ineffective assistance of counsel involves facts outside the record, defendant's first assignment of error is overruled based on the authority of Cooperrider, supra.
Under the second assignment of error, defendant contends that aggravated robbery and theft are allied offenses of similar import, and thus appellant could only be convicted of one offense. We agree.
R.C. 2941.25 states:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
Defendant notes that in State v. Johnson (1983), 6 Ohio St.3d 420, reversed on other grounds, (1984), 467 U.S. 493, the Ohio Supreme Court held in paragraph one of the syllabus that "[a]ggravated robbery, as defined by R.C. 2911.01, is an `allied offense of similar import' to theft, as defined by R.C. 2913.02. (R.C. 2941.25[A], applied)." In Johnson, supra, the court's analysis, based on the language of R.C. 2941.25, was similar to the test set forth in Blockburger v. United States (1932),284 U.S. 299.
In a recent decision, State v. Rance (1999), 85 Ohio St.3d 632,636, the Ohio Supreme Court re-examined Ohio's multiple count statute, noting that "[a] problem inherent in the application of the test for similar/dissimilar import is whether the court should contrast the statutory elements in the abstract or consider the particular facts of the case." In resolving this issue, the court held that "[u]nder an R.C. 2941.25(A) analysis, the statutorily defined elements of offenses that are claimed to be of similar import are compared in the abstract." Rance,supra, at paragraph one of the syllabus, overruling Newark v.Vazirani (1990), 48 Ohio St.3d 81. Thus, the court held that:
 * * * Courts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other.' * * * And if the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus. * * * Rance, supra, at 638-639.
We note that in Rance, although the offenses involved involuntary manslaughter and aggravated robbery, the court noted that "[a]ggravated robbery requires a theft offense or an attempt to commit one." Id. at 639. Other appellate courts have found that "[t]heft is an allied offense of similar import to aggravated robbery, in that theft does not require the proof of any element not required to be proved for the offense of aggravated robbery."State v. Clements (May 3, 1989), Hamilton App. No. C-880172, unreported. See, also, State v. Harvey (Oct. 30, 1997), Cuyahoga App. No. 71774, unreported ("The elements of the offense of theft correspond with those of aggravated robbery").
In the present case, we conclude that, in considering the elements of aggravated robbery and theft "in the abstract * * * the statutory elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other.'" Rance, supra, at 638. Further, the crimes were not committed separately or with separate animus. Thus, the trial court erred in separately sentencing defendant for both offenses. Further, although defendant's trial counsel failed to object at sentencing, "when an accused is sentenced for two crimes arising from what is undisputedly a single theft, the error is plain."State v. Lang (1995), 102 Ohio App.3d 243, 251. Thus, trial counsel's failure to object does not preclude our consideration of this error in the proceedings.
Accordingly, defendant's second assignment of error is sustained and this matter is remanded to the trial court for resentencing.
Based upon the foregoing, the first assignment of error is overruled, the second assignment of error is sustained, the judgment of the trial court is affirmed in part and reversed in part and this matter is remanded to the trial court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part, reversed in part; and causeremanded.
TYACK, J., and LAZARUS, P.J., concur.