The STATE of Ohio, Appellee,

v.

WATKINS, Appellant.

[Cite as *State v. Watkins*, 186 Ohio App.3d 619, 2010-Ohio-740.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 08–CA–122.

Decided Feb. 26, 2010.

620

Stephen A. Schumaker, Clark County Prosecuting Attorney, and Amy M. Smith, Assistant Prosecuting Attorney, for appellee.

Charles W. Slicer III, for appellant.

FAIN, Judge.

{¶ 1} Defendant-appellant, Jon Watkins, appeals his conviction and sentence for one count of aggravated robbery and one count of kidnapping. Watkins argues that his convictions are against the manifest weight of the evidence and that they are not supported by sufficient evidence. He claims that he was denied the effective assistance of trial counsel. Watkins maintains that his sentence is contrary to law because the court failed to expressly address either the purposes and principles of felony sentencing set forth in R.C. 2929.11 or the seriousness and recidivism factors enumerated in R.C. 2929.12. He also argues that the trial court abused its discretion in imposing maximum consecutive sentences. We conclude that Watkins's convictions are supported by sufficient evidence and that they are not against the manifest weight of the evidence. We conclude that Watkins was not denied the effective assistance of trial counsel. We conclude that although the trial court did consider the statutory factors, the trial court nevertheless abused its discretion in imposing maximum, consecutive sentences. Accordingly, the sentence imposed by the trial court is reversed, the judgment of the trial court is affirmed in all other respects, and this cause is remanded for resentencing.

I

{¶ 2} On the evening of July 20, 2008, Katelyn Kuntz and her friend, Cheryl Palmer, decided to go to the Clark County Fair. They called a mutual friend, Kelvin Cobb, to invite him along. In turn, Cobb called his friend Jon Watkins. Kuntz and Palmer picked up Cobb and then Watkins, and the four drove to the fairgrounds. Upon arrival, they realized that the fair was closing. Cobb wanted to go home to spend time with his girlfriend, so Kuntz dropped him off at about 10:00 p.m. As Kuntz, Watkins, and Palmer drove to Palmer's home, the women discussed Kuntz's plans to purchase a car the following day with money she had recently received as a graduation gift.

{¶ 3} About an hour later, Kuntz decided to go home, and she offered Watkins a ride. At his request, she dropped him off at Cobb's home before she drove home herself. Kuntz noticed three men wearing bandanas near the Cobb home. Watkins planned to have Cobb's brother drive him home, but when he arrived at the Cobb home, the brother was asleep. Watkins made a few calls to get Kuntz's phone number, and then called Kuntz and asked her to come back to pick him up. Kuntz briefly went inside her house, leaving her purse in her bedroom, before she returned to the Cobb home.

{¶ 4} When Kuntz arrived, she did not see Watkins on the porch as she had expected, so she called him to tell him that she was there. Watkins came out and started to get into the passenger seat but then claimed that he had forgotten his cell phone. He turned back to the house, leaving the passenger door open. As Kuntz leaned across to close the passenger door so that she could lock the doors, someone later identified as Luane Dozier opened the driver's door, pointed a gun at her head, and told her to move over. When Kuntz complied, Dozier got into the driver's seat. Watkins got into the back seat with two other men, later identified as Jeremy Jackson and Willie Hudson. Dozier, Jackson, and Hudson wore bandanas covering the lower halves of their faces.

{¶ 5} As Dozier drove around Springfield, he, Jackson, and Hudson kept telling Kuntz that they knew she had money, and they repeatedly demanded that she give them her money. Dozier parked the car and ordered Kuntz out. Dozier and Hudson alternated holding the gun on Kuntz and searching her vehicle, while Jackson and Watkins stood behind the car. Finding no money, the young men took Kuntz's cell phone and shoes and the car stereo. Nobody demanded either money or a cell phone from Watkins. The five got back into the car, and Dozier continued to drive around, still demanding money.

{¶ 6} Dozier stopped a second time in an alley parallel to Casilly Street, and the car was again searched. Still finding no money, Dozier forced Kuntz to remove her clothing in order to prove that she was not hiding anything. As she dressed, she heard the four young men talking. Though she could not make out their words clearly, she did recognize Watkins's voice. Following that conversation, Kuntz was allowed to drive away, after first being told to go home and return with $5,000 within ten minutes or they would kill Watkins. The young men demanded Kuntz's house key, in case she did not return. Kuntz gave them a key to her desk and drove away. Watkins and the other three young men went into the house where Hudson, Jackson, and Dozier often stayed. Once inside, the three removed their bandanas. Although Watkins admitted at trial to knowing Dozier, Hudson, and Jackson from high school, he claimed that he did not recognize them until they removed their bandanas.

{¶ 7} Soon after leaving the alley, Kuntz called the police. At first, the police believed that Watkins had also been kidnapped during the course of the robbery. Upon identifying Dozier as a suspect, the police arrived at the house on Casilly Street, but Dozier had already left. The police spoke with Jackson and Hudson, both of whom denied that Watkins was there. The police left and went to speak with Cobb, who mentioned Jackson as being the only person in the area with whom Watkins was likely to spend time.

{¶ 8} The officers returned to the house on Casilly. At first, Jennifer Bowshier, the homeowner or renter, refused to allow the police to search the home, demanding that they secure a search warrant. During the wait for that warrant, however, she changed her mind and agreed to sign a consent-to-search form. When the officers searched the home, they found Watkins hiding under a mattress in an upstairs bedroom. He had his cell phone and his wallet containing about $50 in his possession. The police also found Kuntz's cell phone in the house.

{¶ 9} Dozier, Hudson, and Jackson testified that Watkins arranged the robbery. When Watkins learned that Kuntz had money to buy a car, he sent a texted message to Jackson, and the two made arrangements for her to be robbed that night in front of the Cobb home. Jackson shared the messages with Hudson, and the two recruited Dozier. After the first attempt failed, when Kuntz drove away from the Cobb home too quickly, the four young men discussed a new plan, leading Watkins to call Kuntz for another ride.

{¶ 10} Dozier, Hudson, and Jackson all testified that nobody forced Watkins to get into Kuntz's car or to go with them to the house on Casilly after Kuntz left. In fact, Hudson testified that Watkins was told to leave, but he declined, claiming that he was scared and had no place to go. Dozier briefly left, and the others went to sleep until the police arrived. They testified that during the robbery, Jackson pretended to hit Watkins in order to convince Kuntz that Watkins was a victim.

{¶ 11} When he was first questioned, Watkins never said that he was a victim. During his second interview, Watkins told police that he was threatened and kidnapped along with Kuntz. He said that the robbers had forced him to go with them and to hide under the mattress. He insisted that he did not know any of the perpetrators. He explained his being with Jackson by claiming that after his unknown abductors allowed him to go, he happened to run into Jackson.

{¶ 12} Watkins was indicted on two counts each of robbery and kidnapping, and one count each of aggravated robbery and abduction. All counts included firearm specifications. A jury found Watkins guilty of all charges but not guilty of the specifications. The robbery convictions were merged into the aggravated-robbery conviction, and the abduction and one kidnapping conviction were

merged into the second kidnapping conviction. The trial court ordered a maximum, ten-year sentence for aggravated robbery to be served consecutively to a maximum, eight-year sentence for kidnapping, for an aggregate sentence of 18 years. From his conviction and sentence, Watkins appeals.

## II

{¶ 13} Watkins's first assignment of error is as follows:

{¶ 14} "Appellant's conviction for complicity to aggravated robbery and kidnapping was against the manifest weight of the evidence and the evidence was insufficient to support appellant's conviction."

{¶ 15} In his first assignment of error, Watkins maintains that his convictions are not supported by sufficient evidence and that they are against the manifest weight of the evidence. In support, Watkins claims that because the state's case hinged on the text messages between himself and Jackson, the state should have offered documentary proof of those calls from the carrier. He also argues that the testimony of Jackson, Dozier, and Hudson is not credible. From our review of the record, we conclude that Watkins's convictions are supported by sufficient evidence and that they are not against the manifest weight of the evidence.

{¶ 16} A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. The proper test to apply to this inquiry is the one set forth in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶ 17} In contrast, when reviewing a judgment under a manifest-weight standard of review, " '[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.' " *Thompkins* at 387, 678 N.E.2d 541,

quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 18} Watkins was convicted of aggravated robbery, in violation of R.C. 2911.01(A)(1), which states, "No person, in attempting or committing a theft offense * * *, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." Watkins was also convicted of kidnapping, in violation of R.C. 2905.01(A)(2), which states, "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o facilitate the commission of any felony or flight thereafter."

{¶ 19} The state's evidence shows that Watkins was present during a conversation between Kuntz and Palmer regarding money that Kuntz was going to spend on a car the following day. Watkins made arrangements with Jackson to rob Kuntz, and he twice caused Kuntz to be present in front of the Cobb home, which was conveniently close to the house on Casilly where Jackson, Hudson, and Dozier were staying. First, he asked her to drop him off at Cobb's home, despite being aware that Cobb had left their company just an hour earlier in order to spend time with his girlfriend. Watkins claimed that he would have Cobb's brother take him home, which was unnecessary since Kuntz had already offered him a ride.

{¶ 20} When the first attempt to rob Kuntz failed, Watkins arranged to have her return to the Cobb home. Even assuming that Cobb's brother was not able to take Watkins home, he could have asked Cobb's mother, with whom he spoke while waiting for Kuntz. Or he could have called his own parents to give him a ride. In fact, Watkins's mother testified that she usually provided Watkins with rides. Instead, Watkins made multiple calls trying to obtain Kuntz's telephone number, in order to ask her to come back to the Cobb home.

{¶ 21} When Kuntz arrived for the second time, Watkins was not waiting on the porch as he had told her he would. Instead, she had to call him to let him know that she was waiting. When Watkins came out to the car, he decided to gain time by claiming that he had left his phone in the house, the phone on which he had answered Kuntz's call just moments before. Before he walked back to the house, he left the passenger door open, preventing Kuntz from locking her doors, which in turn allowed Dozier to open the drivers side door and point a gun at Kuntz's head. Watkins then got into Kuntz's vehicle with Dozier, Jackson, and Hudson.

{¶ 22} Dozier drove around Springfield while he, Jackson, and Hudson insisted that they knew that Kuntz had money and demanded that she give it to them.

Dozier parked, and he and Hudson searched the vehicle, while Jackson and Watkins stood at the back. Finding no money, they took Kuntz's cell phone, shoes, and the stereo from the vehicle.

{¶ 23} Despite finding no money during the first search, the three continued to insist that Kuntz had money. Apparently realizing that the money might be in the bank, there was a suggestion that Kuntz withdraw money with an ATM card, but she did not have one. They then searched the vehicle for a second time, even forcing Kuntz to undress. Following some conversation among the four young men, during which Kuntz could hear Watkins's voice, Kuntz was allowed to leave, after first being instructed to go home and return in ten minutes with the money. These actions indicate a level of confidence that Kuntz had ready access to a large sum of money.

{¶ 24} A gun was pointed at Kuntz throughout most of the ordeal, but she never saw the gun pointed at Watkins. Furthermore, Jackson, Hudson, and Dozier never demanded the money in Watkins's wallet, nor did they ever ask for his cell phone or other property.

{¶ 25} As Kuntz left, Watkins accompanied the others to the house on Casilly, behind which Dozier had parked Kuntz's vehicle. Watkins was encouraged to leave, but he chose not to do so. Watkins turned off his cell phone when Kuntz's friends tried to contact him, and he did not use the phone to call or text for help, even while left alone in an attic bedroom. Moreover, Watkins did not attempt to call out to the police for help either time that the police were at the house. Instead, he hid from them. The officers also found Kuntz's cell phone in the house.

{¶ 26} When he was questioned, Watkins at first did not claim to be a victim. When he was next interviewed, he claimed that he was a victim, but he denied knowing the identity of the perpetrators. Yet, he admitted that he knew all three from high school, and he acknowledged that they removed their bandanas in his presence. He told police that he was with Jackson because after his unknown abductors let him go, he happened to run into Jackson.

{¶ 27} Watkins does not challenge any particular elements of the crimes of which he was convicted. Instead, he maintains that records should exist of the texts between his phone and Jackson's, but that the state failed to offer those records, "presumably because those records were contrary to the State's claims." In the record before us, however, there is no evidence that records of the text messages exist and there is no basis for inferring that the state acted improperly in this regard.

{¶ 28} Watkins argues that the testimony of Dozier, Jackson, and Hudson is not credible because of their own criminal behavior and their desire to mitigate

their own punishment. The credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212.

{¶ 29} As the state points out, the jury was aware of the criminal behavior of Dozier, Jackson, and Hudson. The jury knew that Dozier had already been adjudicated and committed to the Department of Youth Services—he had nothing to gain by his testimony. Hudson had been convicted of aggravated robbery and abduction in regard to this case and burglary in another case, and his sentences for both cases were pending at the time of Watkins's trial. In return for Dozier's testimony, the state promised only to make the court aware of his cooperation. He was later ordered to serve 13 years for his participation in the aggravated robbery and abduction. Jackson had reached an agreement to plead to aggravated robbery and agree to a six-year sentence in exchange for his testimony.

{¶ 30} Moreover, the jury heard the testimony of all of the witnesses and observed their demeanor. Because the jury "is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *State v. Spears*, 178 Ohio App.3d 580, 2008-Ohio-5181, 899 N.E.2d 188, ¶ 12, quoting *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. The jury's verdict reflects that it found the testimony of the state's witnesses more credible than that of Watkins.

{¶ 31} Based on the record before us, we conclude that there is sufficient evidence in this record to warrant submitting the case to the jury. Moreover, we do not conclude that the jury clearly lost its way or that there has been a manifest miscarriage of justice.

{¶ 32} Watkins's first assignment of error is overruled.

### III

{¶ 33} Watkins's second assignment of error is as follows:

{¶ 34} "The sentence of the trial court is contrary to law because it fails to reflect any consideration of the purposes and principles of felony sentencing contained in R.C. 2929.11 or the seriousness and recidivism factors of R.C. 2929.12."

{¶ 35} Watkins's third assignment of error is as follows:

{¶ 36} "The trial court committed abuse of discretion when it imposed maximum and consecutive sentences without adequate justification."

{¶ 37} In his second assignment of error, Watkins insists that his sentence is contrary to law, because the trial court failed to address, expressly, either the

purposes and principles of felony sentencing set forth in R.C. 2929.11 or the seriousness and recidivism factors enumerated in R.C. 2929.12, at his sentencing hearing. In his third assignment of error, Watkins contends that the trial court abused its discretion in ordering maximum consecutive sentences. In support, he again argues that the trial court failed to apply the R.C. 2929.11 and 2929.12 factors. Watkins also stresses that he had no prior criminal record and that despite their criminal histories, his co-defendants received substantially lesser sentences.

{¶ 38} Sentencing errors assigned regarding the trial court's application of R.C. 2929.11 and 2929.12 are reversible or modifiable only upon a finding by clear and convincing evidence that the sentence is contrary to law. *State v. Hawkins*, Greene App. No. 06CA79, 2007-Ohio-3581, 2007 WL 2019663, ¶ 8. See also *State v. Bowshier*, Clark App. No. 08–CA–58, 2009-Ohio-3429, 2009 WL 2031670, ¶ 6, citing *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124; *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1. " ' "[C]ontrary to law" means that a sentencing decision manifestly ignores an issue or factor which a statute requires a court to consider.' " *Hawkins* at ¶ 8, quoting *State v. Lofton*, Montgomery App. No. 19852, 2004-Ohio-169, 2004 WL 67960, ¶ 11.

{¶ 39} When a trial court imposes a sentence that falls within the applicable statutory range, the court is required to consider the purposes and principles set forth in R.C. 2929.11, as well as the recidivism factors enumerated in R.C. 2929.12. *Hawkins* at ¶ 8, citing *Mathis*. However, the court need not make any specific findings in order to demonstrate its consideration of those factors. Id., citing *State v. Arnett* (2000), 88 Ohio St.3d 208, 215, 724 N.E.2d 793; *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 42.

{¶ 40} Although it is true that the trial court in this case did not specifically mention either R.C. 2929.11 or 2929.12 at the sentencing hearing, the court did refer to both statutes in its sentencing entry. A trial court speaks through its journal entries. *State v. Brooke*, 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024, ¶ 47. In its entry, the trial court stated, "The Court has considered the record, oral statements, any victim impact statement and presentence report prepared, as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and has balanced the seriousness and recidivism factors [set forth in] Ohio Revised Code Section 2929.12." Because the trial court has stated that it considered the factors set out in both R.C. 2929.11 and 2929.12 in imposing Watkins's sentence, that sentence is not contrary to law. See, e.g., *Hawkins*, 2007-Ohio-3581, 2007 WL 2019663, at ¶ 10, citing *State v. Peck*, Champaign App. No. 2003–CA–30, 2004-Ohio-6231, 2004 WL 2659182.

{¶ 41} Once we have concluded that Watkins's sentence is not contrary to law, we must review his sentence under an abuse-of-discretion standard. *Bowshier*, 2009-Ohio-3429, 2009 WL 2031670, citing *Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. Since at least 1940, innumerable Ohio cases have stated that an abuse of discretion "means more than an error of law or judgment," which incorrectly implies that a trial court may commit an error of law without abusing its discretion. *State v. Boles*, Montgomery App. No. 23037, 2010-Ohio-278, 2010 WL 334852, ¶ 15. To the contrary, "[n]o court—not a trial court, not an appellate court, nor even a supreme court—has the authority, within its discretion, to commit an error of law." Id. at ¶ 26. The abuse-of-discretion standard is more accurately defined as " '[a]n appellate court's standard for reviewing a decision that is asserted to be grossly unsound, unreasonable, illegal, or unsupported by the evidence.' " Id. at ¶ 18, quoting Black's Law Dictionary (8th Ed.2004) 11.

{¶ 42} Although *Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, has freed the trial court from most of the requirements to make statutory findings, the legislative policy remains: "[A] first prison term should be the minimum sentence within the range absent reason to impose a greater sentence." *Bowshier*, 2009-Ohio-3429, 2009 WL 2031670, at ¶ 11. When a trial court imposes more than a minimum sentence for a first-time offender, support for the sentence "should appear in the record [in order] to facilitate the appellate court's review." Id., citing Griffin and Katz, Ohio's Felony Sentencing Law (2007) 208.

{¶ 43} Although no presentence-investigation report was prepared in this case, Watkins pointed out to the trial court that he had no previous criminal history. The state did not disagree with this characterization. The only support offered by the trial court for imposition of more than a minimum sentence for Watkins, as a first-time offender, was the court's statement, "I did sit through two days of trial. I've heard all the facts and understand all the circumstances of the case. I have considered those facts and circumstances."

{¶ 44} It is true that Watkins initiated the events that led to the aggravated robbery and kidnapping of Kuntz. But the other co-defendants are each at least as culpable as Watkins. For example, Jackson could have chosen to reject Watkins's suggestion to rob Kuntz, rather than bringing Hudson and Dozier into the scheme. In turn, both Hudson and Dozier could have tried to stop the crimes. Instead, Dozier is the individual who brought the gun, which he pointed at Kuntz when he opened her car door. Hudson and Dozier were the two who held the gun and conducted the searches of Kuntz's car, and they are the ones who actually took Kuntz's cell phone, shoes, and car stereo.

{¶ 45} Finally, Watkins argues that unlike himself, all of his co-defendants have prior records, yet they received more lenient sentences. Beyond the burglary case that Hudson had pending at the time of his sentencing for his participation in the present case, there is no information in the record to indicate the prior records of any of the co-defendants. As for their sentences for their participation in the crimes against Kuntz, all three co-defendants did receive lesser sentences than Watkins. Dozier was adjudicated as a delinquent child, and he was committed to the Department of Youth Services. As a juvenile, his punishment does not lend itself to easy comparison with his three adult co-defendants. Hudson was convicted of aggravated robbery and abduction and was ordered to serve 13 years for his participation in the crimes against Kuntz. Jackson was convicted of aggravated robbery and received a six-year sentence.

{¶ 46} We conclude that the evidence in this record supports the trial court's implicit conclusion that the imposition of a minimum sentence upon Watkins would demean the seriousness of his criminal conduct. But we also conclude that the facts in the record in this case do not justify maximum consecutive sentences for a first-time offender and that the trial court abused its discretion by imposing maximum consecutive sentences.

{¶ 47} Because Watkins's sentence is not contrary to law, his second assignment of error is overruled. But because we conclude that the imposition of maximum consecutive sentences is not warranted by the evidence in this record, resulting in an 18–year sentence for a first-time offender, Watkins's third assignment of error is sustained.

## IV

{¶ 48} Watkins's fourth assignment of error is as follows:

{¶ 49} "Appellant was denied his constitutional right to effective assistance of counsel."

{¶ 50} In his fourth assignment of error, Watkins argues that he was denied the effective assistance of trial counsel because his attorney failed to consider his input, was poorly prepared for trial, and failed to introduce exculpatory evidence. An attorney who is properly licensed in the state of Ohio is presumed to be competent; therefore, the burden of proving a claim of ineffective assistance of counsel is upon the defendant. *State v. Bays* (Jan. 30, 1998), Greene App. No. 95–CA118, 1998 WL 32595, citing *State v. Jackson* (1980), 64 Ohio St.2d 107, 111, 18 O.O.3d 348, 413 N.E.2d 819. In order to prevail on a claim of ineffective assistance of counsel, the defendant must show both deficient performance, i.e., that counsel's representation fell below an objective standard of reasonableness, and resulting prejudice. *Strickland v. Washington* (1984), 466

U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. We conclude that Watkins fails to meet that burden.

{¶ 51} On the afternoon of the first day of trial, Watkins expressed his desire for new counsel. When the trial court questioned Watkins, he maintained that his attorney was not doing his job because his attorney was failing to present events as they had occurred. Upon further inquiry, the only specific reason Watkins was able to articulate was that his attorney "was not asking the questions that I feel he should be asking. Like I have to write them down for him to ask them." Defense counsel acknowledged that Watkins's parents were similarly unhappy with his representation, and he indicated his preference that Watkins be allowed to hire a new attorney. However, there was no evidence that the attorney-client communication had deteriorated to the point that Watkins's rights were jeopardized. See, e.g., *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 135, citing *State v. Coleman* (1988), 37 Ohio St.3d 286, 292, 525 N.E.2d 792; *State v. Cowans* (1999), 87 Ohio St.3d 68, 73, 717 N.E.2d 298.

{¶ 52} To the contrary, the court observed, "I have noticed periodically the defendant either writing out questions or summoning [his attorney] to counsel table and consulting with him, and then [counsel] asking additional questions so it appears as though if you're not happy, if you feel as though he's not asking all the questions that you want him to ask, that you're able to consult with him and then he is asking follow-up questions." Watkins conceded that although counsel did not word the questions exactly the way he would have liked, counsel did ask the questions. The court also explained to Watkins that although the facts may not have been presented as he would have liked, the trial was still in the stage during which the state was presenting its evidence, and that Watkins would have the opportunity to present his own evidence after the state was finished, if he chose to do so. Upon denying Watkins's request for a new attorney, the court advised him that "up to this point I have not seen anything that should cause me concern with [counsel's] performance, but I will continue to watch that and monitor the situation." This issue was not raised again.

{¶ 53} Watkins also contends that his attorney's having asked Sergeant Tate whether Watkins had ever indicated that force or threats were used against him by Dozier, Jackson, or Hudson is further evidence that counsel was unprepared for trial. He insists that had counsel been prepared, he would never have asked the question, because Tate's negative answer served to undermine his defense that Watkins was a victim and even supported the state's case. Although counsel could have chosen to overlook the inconsistencies in Watkins's various stories to the police, it could also be argued that this inquiry supported Watkins's admission that the first time he spoke with the police, he was not truthful. The

tactical decision to point out instances of Watkins's truthfulness, i.e., that he admitted lying to the police, is a sound trial strategy, which we will not second-guess. See, e.g., *Bays*, Greene App. No. 95–CA118, 1998 WL 32595.

{¶ 54} In regard to the medical records, it is true that counsel failed to call a witness from the hospital who could authenticate the records, as a result of which the records were inadmissible. But the jury did hear Watkins's testimony regarding both his injuries and his hospital visit. Even if counsel had secured the testimony of a hospital employee in order to authenticate the records, it is unlikely that admission of the written records would have changed the outcome of Watkins's trial.

{¶ 55} Finally, to the extent that Watkins argues that counsel's failure to offer his cell phone records in order to prove that there were no texts between himself and Jackson, we again point out that from the record before us, there is no evidence that these records existed. "In reviewing claims of ineffective assistance of trial counsel * * *, we are limited to the consideration of facts appearing in the record." *Bays* at *24, citing *State v. Booker* (1989), 63 Ohio App.3d 459, 466, 579 N.E.2d 264; *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 228, 4 OBR 580, 448 N.E.2d 452.

{¶ 56} Because Watkins has failed to meet his burden of proving that he was denied the effective assistance of trial counsel, his fourth assignment of error is overruled.

## V

{¶ 57} Watkins's third assignment of error having been sustained, and all his other assignments of error having been overruled, the sentence imposed by the trial court is reversed, the judgments of conviction are affirmed, and this cause is remanded for resentencing.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BROGAN and FROELICH, JJ., concur.